Carlos B. GARCIA, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Jamal BARGHOUTI, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Nos. 92–4107, 92–3439.

United States Court of Appeals,
Seventh Circuit.

Argued April 27, 1993.

Decided Oct. 21, 1993.

Meredith J. Ross, David D. Cook, Christopher Burke (argued), Legal Assistance to Institutionalized Persons University of Wisconsin Law School, Madison, WI, for Carlos B. Garcia.

Richard M. Evans (argued), Department of Justice, Office of Immigration Litigation, William P. Barr, Office of U.S. Atty. Gen., Washington, DC, Samuel Der–Yeghiayan, I.N.S., Chicago, IL, for I.N.S. in No. 92–4107.

Carlina Tapia–Ruano, Chicago, IL (argued), for Jamal F. Barghouti.

Fred Foreman, U.S. Atty., Office of U.S. Atty., Crim. Div., Chicago, IL, Richard M. Evans (argued), William J. Howard, David J. Kline, Robert Kendall, Jr., Dept. of Justice Office of Immigration Litigation, Washington, DC, A.D. Moyer, Roger Piper, I.N.S., Chicago, IL, Emily Radford, I.N.S., Washington, DC, for I.N.S. in No. 92–3439.

Before FLAUM, RIPPLE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

These cases pose the question whether an alien, found deportable as an aggravated felon, is automatically barred from the relief of withholding of deportation without a determination of whether he constitutes a danger to the community. We join the three other circuits that have addressed the issue and hold that the alien is so barred.

## I.

The pertinent facts of the two cases are similar. Carlos Garcia is a citizen of El Salvador. He entered the United States on March 5, 1981, and became a lawful permanent resident alien on May 24, 1990. A year later, he was convicted in Wisconsin of five counts of conspiring to deliver cocaine. He was sentenced to 57 months on each count, the sentences to run concurrently.

The Immigration and Naturalization Service (INS) instituted deportation proceedings against Garcia in early 1992. At his July, 1992 deportation hearing at Waupun Correctional Institution, Garcia conceded deportability under sections 241(a)(2)(B)(i) (conviction relating to a controlled substance) and 241(a)(2)(A)(iii) (conviction of an aggravated felony) of the Immigration and Nationality Act (INA). He sought relief from deportation in the form of asylum and withholding of deportation. The Immigration Judge determined that because Garcia had been convicted of an "aggravated felony," he was ineligible to apply for asylum or withholding of deportation. The Board of Immigration Appeals (BIA) dismissed the appeal.

Jamal Barghouti is a native of Jordan who entered the United States in 1977. He claims that he is now stateless, having been found guilty and sentenced to death *in absentia* for killing a member of King Hussein's elite guard during a bar fight in Chicago. (In this country, he was tried for that crime and found not guilty by virtue of self-defense.) Barghouti was convicted in 1985 of possession of a controlled substance and in 1988 of delivery of cocaine. A deportation hearing was held in December, 1991. The Immigration Judge decided that he was not eligible for asylum or withholding of deportation because of those convictions, and the BIA dismissed the appeal.

## II.

The Refugee Act of 1980 established the basic framework for current refugee law. Under the Act, there are two forms of relief whereby an otherwise deportable alien may avoid deportation to a country in which he will face persecution. The first is asylum. *See* INA § 208, 8 U.S.C. § 1158. An alien granted asylum is permitted to remain in the United States and may even become eligible for permanent residence one year later. To qualify for asylum, the alien must establish that he has a "well-founded fear of persecution" if he returns to his home country. *See id.; INS v. Cardoza–Fonseca,* 480 U.S. 421, 428, 107 S.Ct. 1207, 1211, 94 L.Ed.2d 434

(1987). Even upon that showing, however, the Attorney General may, in her discretion, deny relief. *See id.* at 428 n. 5, 107 S.Ct. at 1211 n. 5.

The second form of relief, withholding of deportation, is a narrower remedy. *See* INA § 243(h), 8 U.S.C. § 1253(h). It saves an alien from forced repatriation to a particular country, but it does not preclude deportation if he would not face persecution elsewhere. To qualify for withholding of deportation, the alien must establish that he faces a "clear probability of persecution" if returned to his home country, *see INS v. Stevic,* 467 U.S. 407, 430, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984), a more demanding standard than asylum requires. When an alien is able to make that showing, relief must be granted, unless the alien falls within one of the statutory bars to relief. The most important of those bars, for our purposes, is that withholding of deportation is unavailable if the Attorney General determines that "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1253(h)(2)(B).

In *Matter of Carballe,* 18 I. & N. Dec. 357 (BIA 1986), the BIA considered the question whether the latter exception requires two separate and distinct factual determinations—one to decide whether the alien has been convicted of a particularly serious crime, and another to determine whether he constitutes a danger to the community of the United States. Rejecting that interpretation, the BIA held that the two clauses are "inextricably related": a single finding that the alien has been convicted of a particularly serious crime is sufficient. "If it is determined that the crime was a 'particularly serious' one, the question of whether the alien is a danger to the community is answered in the affirmative." *Id.* at 360. Even before *Carballe* was decided, the Eleventh Circuit had reached the same conclusion. *See Crespo–Gomez v. Richard,* 780 F.2d 932, 934–35 (11th Cir.1986); *see also Zardui–Quintana v. Richard,* 768 F.2d 1213, 1222 (11th Cir.1985) (Vance, J., concurring in the result).

The Immigration Act of 1990, Pub.L. 101–649, 104 Stat. 4978 (1990) (IMMACT), creat-

ed new restrictions on the availability of asylum and withholding of deportation for certain classes of aliens. In particular, these changes affected aliens convicted of "aggravated felonies," a category encompassing an assortment of crimes that include "any illicit trafficking in any controlled substance ..., including any drug trafficking crime as defined in section 924(c)(2) of Title 18 ... or any attempt or conspiracy to commit any such Act." 8 U.S.C. § 1101(a)(43) (1988 & Supp. II 1990). In the context of asylum, section 515 of IMMACT added a new subsection (d) to section 208 which provides that "[a]n alien who has been convicted of an aggravated felony, notwithstanding [any other provision], may not apply for or be granted asylum." *Id.* § 1158(d). Section 515 of IMMACT also amended the withholding of deportation provisions. Referring back to subparagraph (B) of section 243(h)(2), which precluded relief if "the alien, having been convicted of a particularly serious crime, constitutes a danger to the community of the United States," a new sentence was added stating:

> For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

*Id.* § 1253(h)(2).

In light of the previous holding of *Matter of Carballe,* this last amendment raised the natural question whether the determination that an alien was convicted of an aggravated felony precluded that alien's eligibility for withholding of deportation without a further determination of dangerousness. *In Matter of K—,* Int.Dec. 3163 (BIA Nov. 5, 1991), the BIA answered in the affirmative. It began by presuming that Congress was aware of its prior construction of section 243(h)(2)(B) in *Carballe.* The BIA noted that IMMACT left the grammar of section 243(h)(2)(B) intact; it merely clarified or elaborated on the meaning of "particularly serious crime." It was also unpersuaded by the argument that Congress would have used the same unambiguous language from the asylum amendment if it had intended absolutely to preclude aggravated felons from receiving withholding of deportation. Given the existing *Carballe* in-

terpretation of section 243(h)(2)(B), the BIA observed that it was far easier for Congress simply to build on that structure by providing that aggravated felonies are themselves particularly serious crimes, rather than creating a new independent bar based on conviction for an aggravated felony.

The BIA also rebuffed the argument that two separate factual determinations were necessary because it is unreasonable to believe that all aggravated felons will pose, indefinitely, a danger to the community. *Matter of Carballe* had indicated that the proper focus of section 243(h)(2)(B) is on "the serious nature of the crime and *not* on the likelihood of future serious misconduct on the part of the alien." *Id.* at 10. *Matter of K—* also pointed out that consideration of an alien's rehabilitative potential seemed inconsistent with Congress' goal of streamlining procedures for the prompt deportation of aggravated felons. *See, e.g.,* 8 U.S.C. § 1252(a)(2) (1988) (mandatory detention for aliens convicted of aggravated felonies who are not lawful permanent residents); *id.* § 1252(a)(3) (investigative resources for identifying and tracking alien aggravated felons); *id.* § 1252a(a) (expedited procedures for deportation of incarcerated criminal aliens). It concluded that Congress had taken a strong stand against aliens who commit aggravated felonies, and removal of eligibility for asylum and withholding of deportation were key elements of that approach. *See also Matter of C—,* Int.Dec. 3180 (BIA May 28, 1992).

### III.

In each of the cases before us, the BIA followed its previous decision in *Matter of K—.* We must defer to the BIA's interpretation so long as it is a reasonable reading of the INA on a question to which Congress has not spoken. *See Leal–Rodriguez v. INS,* 990 F.2d 939, 944 (7th Cir.1993); *Variamparambil v. INS,* 831 F.2d 1362, 1367 (7th Cir.1987). Essentially, petitioners [1] argue that *Matter of K—* was wrongly decided and undeserving of our deference. In the alternative, they argue that the BIA's approach violates their constitutional rights.

### A.

■ Petitioners argue first that the BIA's construction renders part of section 243(h)(2)(B) surplusage. In effect, this is an attempt to resurrect the argument *Matter of Carballe* buried—that the BIA's interpretation places all the emphasis on the first clause of the subsection ("convicted of a particularly serious crime") and renders the second clause ("constitutes a danger to the community") nugatory. This argument has been roundly rejected not only by the BIA but also by the Fifth, Ninth, and Eleventh Circuits, all of which have interpreted the grammar of section 243(h)(2)(B) to establish a "cause and effect relationship" between the clauses whereby conviction of a particularly serious crime indicates that the alien offender represents a danger to the community. *See Martins v. INS,* 972 F.2d 657, 660–61 (5th Cir.1992) (per curiam); *Ramirez–Ramos v. INS,* 814 F.2d 1394, 1397 (9th Cir.1987); *Arauz v. Rivkind,* 845 F.2d 271, 275 (11th Cir.1985); *see also Saleh v. INS,* 962 F.2d 234, 240–41 (2d Cir.1992). We also accept that reading of section 243(h)(2)(B). "If Congress had intended that the director make two separate findings, it could have easily manifested its intent by simply connecting the two clauses with the conjunction 'and.' " *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1222 (11th Cir.1985) (Vance, J., concurring in the result).

Petitioners support their grammatical argument with comparisons between the newly-amended section 243(h)(2) and other related provisions of the INA. They observe that IMMACT unequivocally barred aggravated felons from receiving asylum. They query why Congress chose a roundabout construction to amend section 243(h)(2), rather than stating succinctly—if it so intended—that aggravated felons may not receive relief through withholding of deportation. Petitioners also observe that alien aggravated felons may be released from custody if they can demonstrate that they pose no threat to the community and will appear before any scheduled hearings. *See* 8 U.S.C. § 1252(a)(2)(B) (1988 & Supp. II 1990); *Mat-*

---

1. For simplicity, we will treat each argument as if raised by both Garcia and Barghouti.

*ter of De La Cruz,* Int.Dec. 3155 (BIA July 16, 1991). They argue that the laxity of the bail provisions shows that dangerousness is relevant even when an alien is guilty of a particularly serious crime.

Indeed, Congress used different language to effectuate its intent in each of these situations. Concededly, the amendment to the asylum provision reads in a more straightforward fashion than the amendment to section 243(h)(2). But the bail provisions show likewise that when Congress truly intends to condition relief on an alien's dangerousness, it knows how to do so in clear language.[2] *See also* 8 U.S.C. § 1226 (1988 & Supp. II 1990) (granting the Attorney General discretion to release an alien aggravated felon pending a determination of exclusion if "[a] review concludes that the alien will not pose a danger to the safety of other persons or to property"). Beyond these selective comparisons, it is necessary to look at the larger picture of the changes wrought by IMMACT as a whole. That Act systematically strips aliens who commit serious crimes in the United States of the opportunity to enter or remain in this country. In addition to the provisions the BIA cited in *Matter of K—*, see, for example, section 505 of IMMACT (elimination of judicial recommendations against deportation and executive pardons for aggravated felons) (amending 8 U.S.C. § 1251(b)); section 509(a) (aggravated felons cannot have "good moral character," and hence are ineligible for voluntary departure or suspension of deportation) (amending 8 U.S.C. § 1101(f)); section 511 (no waiver of exclusion for aggravated felons who have served terms of imprisonment greater than five years); and section 513 (no automatic stay of deportation for aggravated felons pending judicial review) (amending 8 U.S.C.

§ 1105a(a)(3)). On the basis of the text of section 243(h)(2), we hold that Congress intended to bar aggravated felons absolutely from receiving withholding of deportation.

 Petitioners' final argument is that the BIA's interpretation reads Congress to have tacitly disavowed the United States' obligations under international law. One of main purposes of the Refugee Act of 1980 was to conform United States law to the United Nations Convention Relating to the Status of Refugees, June 28, 1951, 19 U.S.T. 6259, T.I.A.S. No. 6577. *See Sale v. Haitian Ctrs. Council, Inc.,* —— U.S. ——, —— n. 19, 113 S.Ct. 2549, 2557 & n. 19, 125 L.Ed.2d 128 (1993); S.Rep. No. 590, 96th Cong., 2d Sess. 2, 20 (1980); H.R.Rep. No. 781, 96th Cong., 2d Sess. 1, 20 (1980) U.S.Code Cong. & Ad. News pp. 141, 161.[3] Article 33 of the Convention set forth a general principle of "non-refoulement" under which aliens fleeing persecution could not be sent back to their native countries, subject to only a few exceptions. In its entirety, Article 33 provides:

1. No contracting state shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

2. The benefit of the previous provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.

The language of Article 33 was grafted onto the withholding of deportation provisions.

---

2. *Petitioner Garcia adds that, compared to the* bail provisions, the BIA's interpretation of section 243(h)(2). "flies in the face of fundamental principles of Anglo–American criminal jurisprudence relating to dangerousness." He claims that all correctional systems in the United States, federal or state, allow offenders to become eligible for release back into the community once they are no longer dangerous (that is, once they have been rehabilitated). Beyond the fact that the proposed analogy between immigration and criminal processes is less than perfect, Garcia is evidently unaware that the Sentencing Reform

Act of 1984 abolished parole in the federal system.

3. The United States is not a signatory to the Convention itself, but it acceded in 1968 to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention. Following the practice of the Supreme Court, we refer to the Convention rather than the Protocol, even though the Protocol applies. *See id.*

In particular, the second half of Article 33(2) became INA section 243(h)(2)(B).[4]

Petitioners contend that Article 33(2) requires two separate determinations before an alien can be precluded from withholding of deportation. Although the Convention itself does not elaborate on the meaning of Article 33(2), petitioners claim to draw that conclusion from analysis presented in the Office of the United Nations High Commissioner for Refugees (UNHCR), *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) (hereinafter *Handbook*). The Supreme Court has stated that while the Handbook does not "ha[ve] the force of law or in any way bind[ ] the INS," it nevertheless "provides significant guidance in construing the Protocol, to which Congress sought to conform." *Cardoza–Fonseca*, 480 U.S. at 439 n. 22, 107 S.Ct. at 1217 n. 22.

The Handbook recommends that the immigration examiner who is deciding whether to extend refugee status to an alien "ascertain the relevant facts of the case," *Handbook, supra*, ¶ 29, and "[e]nsure that the applicant presents his case as fully as possible and with all available evidence," *id.* ¶ 205(b)(i). Similarly, it states that in the context of aliens guilty of criminal conduct, "all the relevant factors—including any mitigating circumstances—must be taken into account." *Id.* ¶ 157. But these are general statements that do not help greatly with the interpretation of Article 33(2). The Handbook, in fact,

has little to say directly about Article 33(2), except for a single paragraph which recites, unhelpfully, that a refugee may be expelled "if, having been convicted of a 'particularly serious' common crime, he constitutes a danger to the community of his country of refuge." *Id.* ¶ 154.[5]

As petitioners show, a number of commentators have charged that IMMACT is inconsistent with the United States' international obligations under the Convention. It is important to note, however, that they have focused mostly on that statute's expansion and rigidification of the term "particularly serious crime," and less on its supposed subversion of the "danger to the community of the United States" clause. For example, a representative of the UNHCR expressed concern in 1990 that proposed legislation (on which IMMACT was eventually based) would greatly broaden the list of crimes for which a conviction would spell ineligibility for withholding of deportation. The official complained that such a list "would seem to prevent the kind of individualized review of the entirety of a case which is necessary to uphold the principle of *non-refoulement.*" Letter from John McCallin, UNHCR Representative, to Alan K. Simpson, U.S. Senator 3 (May 1, 1990). Another commentator argues that IMMACT undermines the U.N. Convention in two respects: it does not allow for balancing of an alien's criminal conviction

---

4. In fact, Article 33(2) and section 243(h)(2) do not match in every detail, but Congress believed that the latter was based directly on the Convention and intended it to be so interpreted. *See* Evangeline G. Abriel, *Presumed Ineligible: The Effect of Criminal Convictions on Applications for Asylum and Withholding of Deportation Under Section 515 of the Immigration Act of 1990*, 6 Geo.Immigr.L.J. 27, 38 & n. 45 (1992). That provides another powerful reason why Congress chose to phrase the 1990 amendments to the asylum and withholding of deportation provisions in different ways. When Congress added the provision equating aggravated felonies with particularly serious crimes, it evidently sought to work within the categories for exclusion from relief that the Convention had established, rather than devising totally new provisions that would take it outside the Convention's framework. Adding a clarification of one of the terms in subparagraph (B), without rewriting subparagraph (B) itself, disturbed the grammar of section 243(h)(2) as little as possible. Congress'

efforts to amend the asylum provision were not subject to the same constraint because the Convention did not create a right to asylum. For these reasons, the fact that Congress used disparate language in the two provisions does not necessarily establish that it aimed at different results.

5. The reason for the silence is that the Handbook focuses almost exclusively on Article 1 of the Convention, which defines the term "refugee." The Handbook's analysis of aliens who have committed crimes relates to Article 1(F)(b), not Article 33(2), which states: "The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that ... he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee." Importantly, the Protocol bound nations to comply only with Articles 2 through 34 of the Convention. *See* note 3 *supra.*

against other countervailing factors, such as the severity of the persecution the alien will face upon return to his home country; and it equates "particularly serious crime" with "aggravated felony." *See* Abriel, *supra,* at 29. Neither of those arguments has been raised in the cases before us, so we have no occasion to rule on them, although we will comment that Congress' intention to increase the number of crimes that automatically bar eligibility for relief can scarcely be questioned. In any event, it appears that even the sources petitioners cite give little guidance as to whether the second half of Article 33(2) requires two separate determinations or just one. *See id.* 53–55 (surveying various readings of that clause but reaching no resolution). In light of this uncertainty, we conclude that the BIA's interpretation of section 243(h)(2) does not violate Article 33(2).[6]

## B.

■ Petitioners also challenge the BIA's interpretation on constitutional grounds. They argue that they have a protected liberty interest in avoiding deportation that triggers the equal protection and due process components of the Fifth Amendment. They contend that the amended asylum and withholding of deportation provisions violate those constitutional guarantees.

■ Because of the profound deprivation that deportation visits on an individual, all aliens subject to deportation are entitled to fair hearings as a matter of due process. *See Wong Yang Sung v. McGrath,* 339 U.S. 33, 49–50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950); *Kaczmarczyk v. INS,* 933 F.2d 588, 595–96 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991). These aliens, of course, *did* receive fair hearings,

during which immigration judges determined that each petitioner had been convicted of an aggravated felony which made him ineligible for asylum or withholding of deportation. Petitioners contend, however, that they have additional liberty interests in receiving relief through asylum and withholding of deportation. These rights, if they exist, would be created by the asylum and withholding of deportation provisions of the INA itself. Statutes can create entitlements which cannot then be taken away except through the use of fair procedures. *See Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983).

■ The initial question is whether the INA creates entitlements to either form of relief. Section 208, the asylum provision, certainly does not. It grants the Attorney General discretionary power to decide whether any alien shall receive asylum; asylum, therefore, is not a right. By contrast, section 243(h) is written in mandatory language such that an alien is entitled to withholding if he meets the specified criteria. However, one of those criteria is that the alien must not have been convicted by a final judgment of a particularly serious crime, thereby constituting a danger to the community of the United States. Furthermore, the statute states that aggravated felonies are particularly serious crimes. Thus, petitioners are ineligible for withholding of deportation by the terms of the very statute which creates their "entitlement." Due process is not violated by the fact that a statute places substantive conditions, themselves legitimate, on the availability of a particular entitlement. *See Martins v. INS,* 972 F.2d 657, 662 (5th Cir.1992) (per curiam).

---

**6.** Other commentators also seem to find the "danger to the community" clause in Article 33(2) somewhat opaque. One writes that "[i]t is unclear to what extent, if at all, one convicted of a particularly serious crime must also be shown to constitute a danger to the community. The jurisprudence is sparse, and the notion of 'particularly serious crime' is not a term of art...." Guy S. Goodwin–Gill, *The Refugee in International Law* 96 (1983) (citation omitted). He does add, however, that "principles of natural justice and due process of law require something more than mere mechanical application of the excep-

tion," *id.*—a position echoed by the writers cited above. A contrary view is presented in Gunnel Stenberg, *Non–Expulsion and Non–Refoulement: The Prohibition Against Removal of Refugees With Special Reference to Articles 32 and 33 of the 1951 Convention Relating to the Status of Refugees* 227–28 (1989). Stenberg argues that the "danger to the community" clause was meant to constitute an independent test, although even she concedes that "what exactly constitutes a 'danger to the community' ... is difficult to fathom." *Id.* at 227.

Petitioners' other constitutional challenges are similarly doomed to failure. The Supreme Court has repeatedly emphasized that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)). Whether an immigration provision is constitutional depends only on the existence of a " 'facially legitimate and bona fide reason' " for its enactment. *Id.* 430 U.S. at 794, 97 S.Ct. at 1479 (quoting *Kleindeinst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972)). Surely Congress' decision that aliens convicted of drug trafficking offenses should not receive relief from deportation rests on a facially legitimate and bona fide reason. These provisions therefore withstand our limited judicial review.

For the foregoing reasons, the petitions for review are DENIED.