60 F.3d 1084
 Lorenzo KOFA, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.
Washington Lawyers' Committee For Civil Rights Under Law;
American Immigration Lawyers Association; Legal Action
Center of the American Immigration Law Foundation; National
Immigration Project of the National Lawyers Guild, Amici Curiae.
Jorge Samuel MORENO, Petitioner,
v.
U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 Nos. 92-1246, 92-2522.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1994.
Decided July 27, 1995.
 
 ARGUED: Margaret Gleason, Catholic Legal Immigration Network, Washington, DC, for petitioner. Joel Alan Fischman, Dickstein, Shapiro & Morin, Washington, DC, for amici curiae. Frank S. Holleman, III, Civ. Div., U. S. Dept. of Justice, Washington, DC, for respondent. ON BRIEF: Stuart M. Gerson, Asst. Atty. Gen., David J. Kline, Asst. Director, Office of Immigration Litigation, Civ. Div., U. S. Dept. of Justice, Washington, DC, for respondent. Justin D. Simon, Amy M. Nice, Alison N. Davis, Dickstein, Shapiro & Morin, Washington, DC, Lory D. Rosenberg, American Immigration Law Foundation, Washington, DC, for amici curiae.
 Before ERVIN, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.*
 Petitions for review denied by published opinion. Judge WIDENER wrote the majority opinion, in which Judges RUSSELL, WILKINSON, WILKINS, NIEMEYER, LUTTIG, and WILLIAMS joined. Judge HAMILTON wrote a dissenting opinion, in which Chief Judge ERVIN and Judges HALL, MURNAGHAN, and MICHAEL joined.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 The sole issue in these consolidated cases is whether 8 U.S.C. Sec. 1253(h)(2)(B),[1] which authorizes withholding of deportation, requires a separate determination of dangerousness to the community in the case of an aggravated felon. We answer that question in the negative and deny each of the petitions for review.
 
 
 2
 * Case Number 92-1246 concerns Lorenzo Nma Kofa, who is a twenty-three year old citizen of Liberia who has lived in the United States since 1980. He faces deportation to Liberia because of his two 1990 Maryland state law convictions for possession of cocaine with intent to distribute the same, and for distribution of cocaine. Both of these convictions are aggravated felonies. See 8 U.S.C. Sec. 1101(a)(43).
 
 
 3
 On November 9, 1990, the Immigration and Naturalization Service (INS) issued an order to show cause why Kofa should not be deported because of those drug convictions. At a hearing held on April 26, 1991, the Immigration Judge determined that despite the fact that he had been convicted of a particularly serious crime, Kofa could apply for withholding of deportation if he could prove that he was not a danger to the community of the United States. The Immigration Judge held an evidentiary hearing on the issue of danger to the community on May 10, 1991 and found that Kofa was remorseful and there was insufficient evidence to show that he continued to be a danger to the community of the United States. A hearing was then scheduled to determine the merits of his application for withholding of deportation.
 
 
 4
 Following the Immigration Judge's decision and an unsuccessful motion for reconsideration, the INS filed an interlocutory appeal to the Board of Immigration Appeals, taking the position that because he had been convicted of a particularly serious crime, Kofa was statutorily ineligible under 8 U.S.C. Sec. 1253(h)(2)(B) to apply for withholding of deportation. The Board of Immigration Appeals agreed and remanded the case with instructions to the Immigration Judge, Matter of K______, Interim Dec. No. 3163 (B.I.A. Nov. 5, 1991), who then ordered Kofa's deportation to Liberia. Kofa petitions for review of the Board's decision.
 
 
 5
 Case Number 92-2522 concerns Jorge Samuel Moreno-Duran (Moreno), who is a native of El Salvador and a citizen of Panama who describes himself as a "citizen allegedly of El Salvador and Panama." Moreno entered the United States as a nonimmigrant student on January 6, 1981. Because of his marriage to a United States citizen, Moreno was classified as a lawful permanent resident of the United States beginning on September 23, 1987.
 
 
 6
 On February 11, 1988 Moreno was convicted in the Circuit Court of Fairfax County, Virginia, of possession of cocaine with intent to distribute. On June 12, 1992, the INS issued an order to show cause why Moreno should not be deported because of his drug conviction. A hearing on the order to show cause was held on August 4, 1992. The Immigration Judge determined that because of his drug conviction Moreno was deportable under 8 U.S.C. Sec. 1251(a)(2)(B)(i). The Immigration Judge further found that he was statutorily ineligible to apply for withholding of deportation or asylum. The Immigration Judge then ordered him deported to Costa Rica or, if Costa Rica would not accept him, to Panama.
 
 
 7
 Moreno appealed the Immigration Judge's decision to the Board. In a per curiam order, the Board dismissed the appeal without oral argument, finding that Moreno is ineligible for asylum or withholding of deportation because of his drug conviction.[2] Moreno filed his petition for review.
 
 II
 
 8
 The language of Section 1253(h)(2)(B) was enacted on March 17, 1980. Refugee Act of 1980, Pub.L. No. 96-212, Sec. 203(e), 94 Stat. 104 (1980). Subsection (h) of 8 U.S.C. Sec. 1253 provides:
 
 
 9
 (h) Withholding of deportation or return
 
 
 10
 (1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 11
 (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that--
 
 
 12
 ....
 
 
 13
 (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States; ....
 
 
 14
 The Board of Immigration Appeals has interpreted subsection (B) to mean that if it determines that the alien has been convicted of a particularly serious crime, the alien is, necessarily, a danger to the community of the United States and is therefore ineligible for withholding of deportation. Matter of U-M-, Interim Dec. No. 3152, slip op. at 5 (B.I.A. June 5, 1991); Matter of Carballe, 19 I. & N.Dec. 857, 860 (1986), modified in part on other grounds, Matter of Gonzalez, 19 I. & N.Dec. 682, 685 & n. 3 (1988).
 
 
 15
 On November 29, 1990, subsection (h)(2) was amended to add the following language:
 
 
 16
 For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.
 
 
 17
 Immigration Act of 1990, Pub.L. No. 101-649, Sec. 515(a)(2), 104 Stat. 5053 (1990). We are asked in this case to determine whether an alien who has been convicted of an aggravated felony (and therefore, by statute, convicted of a particularly serious crime) is entitled to a separate determination of whether the alien is a danger to the community or whether, as the Board of Immigration Appeals maintains, such an alien is statutorily ineligible for withholding of deportation.
 
 
 18
 * When an agency has construed a statute that we later are asked to construe, the Supreme Court has made plain our task:
 
 
 19
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 20
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (footnotes omitted).
 
 
 21
 Petitioners urge us to look at the legislative history surrounding, and some written even after, the passage of the 1990 Amendments to Section 1253(h)(2) to determine what Congress meant when it enacted the amendment to the language of Section 1253(h)(2)(B). However, the first place where we must look to see if Congress has spoken to the issue with which we are concerned and whether Congressional intent in that regard is clear is on the face of the statute. Statutory construction must begin with the language of the statute. Norfolk & W. Rwy. v. American Train Dispatchers Ass'n, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991); Lewis v. United States, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980); United States v. Sheek, 990 F.2d 150, 152 (4th Cir.1993). To do otherwise would assume that Congress does not express its intent in the words of statutes, but only by way of legislative history, an idea that hopefully all will find unpalatable. See Continental Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund, 916 F.2d 1154, 1157-58 (7th Cir.1990) ("The text of the statute, and not the private intent of the legislators, is the law.... So the text is law and legislative intent a clue to the meaning of the text, rather than the text being a clue to legislative intent.") (citing In re Sinclair, 870 F.2d 1340 (7th Cir.1989)).
 
 
 22
 If the statute is silent or ambiguous on the question, we next turn to the agency's interpretation. We uphold it if it is permissible even if it is not the interpretation we would have given to the same statute. Chevron, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. The agency's construction of the statute is entitled to deference, and we will not substitute our own construction if the agency's construction is reasonable. Newport News Shipbuilding & Dry Dock Co. v. Howard, 904 F.2d 206, 209 (4th Cir.1990).
 
 B
 
 23
 The INS argues that the plain meaning of the statute is that once an alien has been convicted of a particularly serious crime, he therefore is a danger to the community and is ineligible for withholding under 8 U.S.C. Sec. 1253(h)(2)(B). The petitioners argue that the plain meaning of the statute is that once the alien has been convicted of a particularly serious crime, the Attorney General then must determine whether the alien is a danger to the community and, being such, is ineligible for withholding of deportation. In the alternative, they argue that we must look at the legislative history to ascertain Congressional intent, which they argue supports their reading of the statute.
 
 
 24
 We think the meaning of the statute is plain. We agree with the view of the INS that the alien constitutes a danger to the community because he has been convicted of a particularly serious crime, so once the particularly serious crime determination is made, the alien is ineligible for withholding without a separate finding on dangerousness. In light of the language of the statute, we cannot accept the petitioners' reading of it. We construe the statute in accordance with two principles of statutory construction: plain English and common sense. See First United Methodist Church v. United States Gypsum Co., 882 F.2d 862, 869 (4th Cir.1989) (stating that common sense is the "most fundamental guide to statutory construction"), cert. denied, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990); Sutton v. United States, 819 F.2d 1289, 1292 (5th Cir.1987) (stating that the courts have a duty to construe the language in a statute consistent with its plain meaning); The King v. Inhabitants of St. Nicholas, 4 Neville & Manning 422, 426-27 (Eng.K.B.1835) (Denman, C.J.) ("[W]here I find the words of a statute perfectly clear I shall adhere to those words, and shall not allow myself to be diverted from them by any supposed consequences of one kind or the other...."), cited in I Kent's Commentaries, 467-68, n. d (1836). Our interpretation comports with these principles. In addition, this interpretation is one that we share with five other circuits. Al-Salehi v. INS, 47 F.3d 390 (10th Cir.1995); Garcia v. INS, 7 F.3d 1320, 1323 (7th Cir.1993); Martins v. INS, 972 F.2d 657, 660-61 (5th Cir.1992) (per curiam); Arauz v. Rivkind, 845 F.2d 271, 275 (11th Cir.1988); Ramirez-Ramos v. INS, 814 F.2d 1394, 1396-97 (9th Cir.1987); Crespo-Gomez v. Richard, 780 F.2d 932, 934-35 (11th Cir.1986) (per curiam); Zardui-Quintana v. Richard, 768 F.2d 1213, 1221-22 (11th Cir.1985) (Vance, J., concurring); see also Feroz v. INS, 22 F.3d 225 (9th Cir.1994); Urbina-Mauricio v. INS, 989 F.2d 1085, 1087-88 (9th Cir.1993) (applying amended definition of aggravated felony).
 
 C
 
 25
 Even if we were to reject the views of our five sister circuits and decide that the statute's meaning is ambiguous, we still may not follow the legislative history urged upon us. Instead, we turn to the construction the Board of Immigration Appeals has given the language of Sec. 1253(h)(2)(B). Chevron, 467 U.S. at 843, 104 S.Ct. at 2781-82. The language of subsection (B) has been the same since 1980, and the language of the 1990 Amendments did not change subsection (B) in any way. The Board of Immigration Appeals has interpreted it to mean that the proper inquiry, and the only inquiry required, is whether someone has been convicted of a particularly serious crime. How that interpretation is unreasonable has not been brought to our attention, as we think it is entirely consistent with the statute. Because the Board's interpretation is permissible and reasonable, we uphold it. Mosquera-Perez v. INS, 3 F.3d 553, 558-59 (1st Cir.1993); Ramirez-Ramos, 814 F.2d at 1397.
 
 III
 
 26
 Petitioners also raise several other points which they say reveal that our interpretation of the statute is in error.
 
 A. Legislative History
 
 27
 Counsel asks us to look to legislative history, including postenactment legislative history, in an attempt to find that the Board's interpretation (and ours) is inconsistent with Congressional intent.[3] The use of legislative history in this fashion, and especially postenactment legislative history, is a process that has been soundly criticized. See, e.g., Mosquera-Perez, 3 F.3d at 556-58 (criticizing much of the same legislative history relied on by counsel); Martins, 972 F.2d at 661 (same); Continental Can, 916 F.2d at 1157-58 (stating that postenactment statements "do not count" because the term " 'subsequent legislative history' [is] an oxymoron" (citations omitted)); 2B Norman J. Singer, Sutherland Statutory Construction Sec. 49.06, at 59 (5th ed. 1992) ("Little weight is given to postenactment statements by members of Congress."). Further, the legislative history upon which petitioners rely disregards "the most persuasive evidence of Congressional intent," Davis v. Lukhard, 788 F.2d 973, 981 (4th Cir.), cert. denied sub nom. Staton v. Lukhard, 479 U.S. 868, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986), a House Conference Report[4] that supports the causeand-effect reading of the House in H.R.Rep. No. 608, 96th Cong., 1st Sess. 18 (1979) (stating that aliens "who have been convicted of a particularly serious crime which makes them a danger to the community of the United States" are excepted from the withholding provision). Their dependence on other items of legislative history is unavailing and needs no further comment. See Martins, 972 F.2d at 661 (noting that Senator Kennedy's letter is in direct conflict with the House Report).
 
 B. International Law
 
 28
 In addition, petitioners rely on the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, to which the United States acceded in 1968. Accession to the Protocol binds the United States to the United Nation Convention Relating to the Status of Refugees (July 28, 1951), of which the United States is not a signatory. It is true that we must construe the statute consistent with our obligations under international law. See Murray v. The Charming Schooner Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). However, counsel would have us by-pass the language of the Convention itself and instead look at the history of the proceedings that resulted in the Convention and the Handbook issued by the United Nations High Commissioner for Refugees (UNHCR). This invitation we decline.
 
 The text of the Convention reads:
 ARTICLE 33
 
 29
 Prohibition of Expulsion or Return ("Refoulement" )
 
 
 30
 1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.
 
 
 31
 2. The benefit of this provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of that country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country.
 
 
 32
 U.N. Convention Relating to the Status of Refugees, art. 33 (July 28, 1951), 19 U.S.T. 6276 (emphasis added).
 
 
 33
 The language of the Convention relating to refugees who have been convicted of particularly serious crimes is identical to that of Sec. 1253(h)(2)(B). In addition, in its context within the treaty, it becomes even clearer that one who has been convicted of a particularly serious crime is a danger to the community. Others may be such a danger, too, and we therefore may return them if we have "reasonable grounds" for regarding that alien as a danger to the security of the country in which he is, but as to those convicted of particularly serious crimes, the Convention itself tells us that they are a danger such that the return provision may not be used to benefit them.[5]
 
 C. The 1990 Amendments
 
 34
 Finally, petitioners argue that our construction of section 1253(h)(2)(B) is inconsistent with the 1990 amendment to section 1253(h)(2). The argument goes that the 1990 Amendments somehow changed the manner in which the subsection (B) inquiry must be performed. As we noted in Part II, the 1990 amendments added to the end of the section (2) the language:
 
 
 35
 For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.
 
 
 36
 The meaning of the amendment is plain. Speaking through the amendment, Congress tells us that aliens who are convicted of an aggravated felony have committed a particularly serious crime. The Board need not apply the Frentescu test[6] in the case of those who have committed aggravated felonies because Congress has already determined that such aliens have committed particularly serious crimes. It does not foreclose others from being considered as having committed a particularly serious crime, but it explicitly states that those who have been convicted of aggravated felonies have committed a particularly serious crime.
 
 
 37
 Petitioners argue that Congress knew how to bar convicted aggravated felons if it desired to do so, and indeed, Congress enacted just such a bar with respect to asylum. However, that reasoning overlooks the fact that Congress fixed only that which needed fixing: i.e., to accomplish the result it intended, Congress needed only to provide that aggravated felonies were particularly serious crimes. The flaws in reasoning otherwise become apparent when the language in dispute is put into historical context. See Garcia, 7 F.3d at 1323-24.
 
 
 38
 In 1980 Congress passed several amendments to the Immigration and Naturalization Act, after which the relevant portions of the asylum statute read as follows:
 
 
 39
 (a) The Attorney General shall establish a procedure for an alien physically present in the United States ... to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee....
 
 
 40
 8 U.S.C. Sec. 1158 (1988). When compared with the relevant portion of the withholding statute, see Part II, supra, it is seen that under the withholding section, the Attorney General could not consider the application of an alien who was convicted of a particularly serious crime, but under the asylum provision just above quoted the Attorney General had discretion to determine who could apply for asylum.
 
 
 41
 The 1990 Amendments added the following to the asylum provision:
 
 
 42
 (d) An alien who has been convicted of an aggravated felony, notwithstanding subsection (a), may not apply for or be granted asylum.
 
 
 43
 Immigration Act of 1990, Pub.L. No. 101-649, Sec. 515(a)(1), 104 Stat. 5053 (1990) (codified as amended at 8 U.S.C. Sec. 1158). The 1990 Amendments also added to the withholding provision the language stating that an aggravated felony is a particularly serious crime.
 
 
 44
 Consistent with its intent to bar those convicted of aggravated felonies from applying for withholding or asylum, Congress enacted precisely the language needed to carry out the result.
 
 IV
 
 45
 Because we find that there is no requirement of a separate determination of danger to the community of the United States for those who have committed particularly serious crimes and that those who have committed aggravated felonies have committed particularly serious crimes under Section 1253(h)(2)(B), we deny the petitions for review in each case.[7]
 
 The petitions for review are each
 
 46
 DENIED.
 
 HAMILTON, Circuit Judge, dissenting:
 
 47
 This appeal presents a straightforward question of statutory interpretation: whether 8 U.S.C. Sec. 1253(h)(2), which authorizes withholding of deportation of an alien, requires a determination, in the case of an alien who has committed an aggravated felony, that the alien constitutes a danger to the community. Following the decisions of our sister circuits, the majority answers this question in the negative. The majority's interpretation of Sec. 1253(h)(2), which is that urged by the Immigration and Naturalization Service (INS) and adopted by the Board of Immigration Appeals (BIA), ignores the plain language of the statute; indeed, the interpretation embraced by the majority renders key language in the statute nugatory. Because the majority's interpretation of Sec. 1253(h)(2) ignores the plain language of the statute, thereby violating a cardinal rule of statutory interpretation, I respectfully dissent.
 
 
 48
 * A
 
 
 49
 An alien has two distinct statutory remedies to avoid deportation. The first is the asylum remedy which is discretionary. The Attorney General may grant asylum to aliens physically present in this country if they qualify as "refugees." See 8 U.S.C. Sec. 1158(a). The statute defines a refugee as one who is unwilling or unable to return to his or her homeland "because of persecution or a well-founded fear of persecution" on account of race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. Sec. 1101(a)(42)(A). In 1990, as part of the Immigration Act of 1990, Congress added 8 U.S.C. Sec. 1158(d) to provide that:
 
 
 50
 (d) An alien who has been convicted of an aggravated felony, notwithstanding subsection (a) of this section, may not apply for or be granted asylum.
 
 
 51
 Immigration Act of 1990, Pub.L. No. 101-649, Sec. 515(a)(1), 1990 U.S.C.C.A.N. (104 Stat.) 5053.
 
 
 52
 The "withholding of deportation" remedy is the second statutory remedy by which an alien might avoid deportation. It provides that the Attorney General "shall not deport or return" an alien if his or her life or freedom "would be threatened" in his or her home country on account of any one or a combination of the same five grounds enumerated in the asylum provision. See 8 U.S.C. Sec. 1253(h)(1). This remedy is mandatory if the alien successfully shows that his or her life or freedom would be threatened upon return to his or her home country, and provided that an exception does not apply.
 
 
 53
 8 U.S.C. Sec. 1253 provides, in relevant part:
 
 
 54
 (h) Withholding of deportation or return
 
 
 55
 (1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 56
 (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that--
 
 
 57
 * * *
 
 
 58
 (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States.
 
 
 59
 Also in 1990, the following was added to this section:
 
 
 60
 For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.
 
 
 61
 Immigration Act of 1990, Pub.L. No. 101-649, Sec. 515(a)(2), 1990 U.S.C.C.A.N. (104 Stat.) 5053.
 
 B
 
 62
 When reviewing an agency's interpretation of a statute, we must look first to the intent of Congress as expressed by the statutory language. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). If that intent is clear, then we and the agency are bound to give it effect. Id. If Congress explicitly leaves a gap in the legislation then the agency has authority to fill that gap and the agency is entitled to deference on the question unless the agency's interpretation is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. at 2782. If the statute is merely silent or ambiguous on a particular matter and no intent on the part of Congress can be discerned, the court is bound to give deference to an agency interpretation unless the interpretation is unreasonable. Id.
 
 II
 
 63
 The First, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuit Courts of Appeals have considered the meaning of the language of 8 U.S.C. Sec. 1253(h)(2), see Al-Salehi v. INS, 47 F.3d 390 (10th Cir.1995); Garcia v. INS, 7 F.3d 1320 (7th Cir.1993); Mosquera-Perez v. INS, 3 F.3d 553 (1st Cir.1993); Urbina-Mauricio v. INS, 989 F.2d 1085 (9th Cir.1993); Martins v. INS, 972 F.2d 657 (5th Cir.1992); Arauz v. Rivkind, 845 F.2d 271 (11th Cir.1988); Ramirez-Ramos v. INS, 814 F.2d 1394 (9th Cir.1987); Zardui-Quintana v. Richard, 768 F.2d 1213 (11th Cir.1985) (Vance, J. concurring), and concluded that 8 U.S.C. Sec. 1253(h)(2) states a cause and effect; in other words, because an alien committed a particularly serious crime, he or she is per se a danger to the community. The circuit courts have reached this conclusion through two separate avenues. Some courts have concluded that the plain language of Sec. 1253(h)(2) states a cause and effect relationship between conviction and community danger, see, e.g., Arauz, 845 F.2d at 275 (relying on Judge Vance's concurring opinion in Zardui-Quintana in holding that plain language of the statute creates a cause and effect relationship), while others have concluded that the language of the statute is ambiguous, and, consequently, adopted the BIA's cause and effect interpretation as reasonable, see, e.g., Al-Salehi, 47 F.3d at 393 (holding that the BIA's interpretation is entitled to deference and explaining that "[t]he courts generally have recognized that the linguistic structure of Sec. 1253(h)(2)(B) precludes an unequivocal, conclusive interpretation based on language alone"); Mosquera-Perez v. INS, 3 F.3d at 555-59 (holding language of the statute is ambiguous, but BIA's interpretation reasonable).[1] Today, the majority reaches alternative holdings: (1) the majority concludes that the plain language of the statute states a cause and effect relationship between conviction and community danger, and, (2) the majority concludes, that even if the statute is ambiguous, the BIA's interpretation is reasonable, and thus entitled to deference.
 
 
 64
 In my view, the intent of Congress is clear from the plain language of the statute: before an alien can be denied the withholding of deportation remedy, first, the alien must have committed "a particularly serious crime," and second, the Attorney General must make a determination that the alien "constitutes a danger to the community." Because the statute is not silent or ambiguous with respect to the issue at hand, I would end the court's inquiry at this point without regard to the interpretation of the BIA. See Chevron U.S.A., 467 U.S. at 842-43, 104 S.Ct. at 2781-82. Consultation of legislative history would be equally inappropriate, because, although courts "appropriately may refer to a statute's legislative history to resolve statutory ambiguity," Toibb v. Radloff, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991), the clarity of the statutory language at issue in this case, completely obviates the need for such inquiry. See id.; Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917) (stating that if statutory language "is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion").
 
 
 65
 Cavalierly, the decisions of our sister circuits, as well as the majority in this case, disregard the plain language of Sec. 1253(h)(2), which of course is paramount and dispositive. These decisions effectively read out the "danger to the community" language within this statute. Logic dictates that if Congress intended the alien's commission of a "particularly serious crime" to be dispositive of the inquiry and that there be no separate determination of dangerousness by the Attorney General, Congress would not have inserted the "danger to the community" clause in Sec. 1253(h)(2)(B). Reading out the "danger to the community" clause, as the majority and our sister circuits have, violates the well settled rule that when reading or interpreting a statute, a court must strive to give effect to every word contained within the statute, see, e.g., United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955).
 
 
 66
 The support for reading out the "danger to the community" language comes from the notion that, had Congress intended a separate determination, Congress could have made the clauses conjunctive by inserting the word "and" but did not do so. See, e.g., Zardui-Quintana, 768 F.2d at 1222 (Vance, J. concurring). Reduced to its essence, the argument presents a double-edged sword since it is at least equally true that, had Congress intended to create a per se bar to withholding from deportation for aggravated felons, it could have clearly drafted the statute to accomplish this result. For example, Congress could have inserted "if" and "then" in the statute. Alternatively, Congress could have adopted language similar to that in Sec. 1158 as modified by the 1990 Immigration Act. The language added to Sec. 1158 clearly accomplishes, with respect to asylum, what the INS and the BIA seek to have the language in Sec. 1253(h)(2)(B) accomplish by stating: "An alien who has been convicted of an aggravated felony ... may not apply for asylum." 8 U.S.C. Sec. 1158(d). Although this comparison may not, by itself, suggest a particular Congressional intent, it definitely undercuts the suggestion that the failure to draft Sec. 1253(h)(2)(B) in the conjunctive requires a cause and effect relationship. Moreover, reliance on Congress' failure to employ the word "and" focuses on what Congress should have said rather than what Congress has said, which, of course, is paramount.
 
 
 67
 Perhaps even more critical, a cause and effect reading of Sec. 1253(h)(2)(B) reads out the language "the Attorney general determines," contained in Sec. 1253(h)(2). Thus, in another respect, the cause and effect reading of the statute violates the canon of statutory construction that when reading or interpreting a statute, we must strive to give effect to every word contained within the statute, see Menasche, 348 U.S. at 538-39, 75 S.Ct. at 519-20. In contrast to the cause and effect reading propounded by the majority and our sister circuits, a reading requiring the Attorney General to consider the danger to the community that an alien convicted of a particularly serious crime presents gives effect to both clauses and the language "the Attorney General determines." According to the grammatical construction of Sec. 1253(h)(2), what the Attorney General must determine is whether the alien presents a danger to the community, not whether the alien has been convicted of a particularly serious crime. Deciding if an alien has been convicted of a particularly serious crime is not a "determination" at all. By its terms, the statute defines "particularly serious crime" as an "aggravated felony," which is itself defined in Sec. 1101(a)(43). Because the statute defines "particularly serious crime," it is illogical to conclude that Congress thought it necessary to direct the Attorney General to "determine" whether a crime falls within the statutory list at Sec. 1101(a)(43). Indeed, Congress did not direct the Attorney General to determine if an alien committed an aggravated felony with respect to the asylum provisions. Compare 8 U.S.C. Sec. 1253(h)(2) with 8 U.S.C. Sec. 1158(d).
 
 
 68
 Conspicuously, the majority opinion in this case never attempts to harmonize the language "the Attorney General determines" with the conviction and the danger to community clauses; rather, the majority's interpretation of the statute hides in a conclusory ruse: "plain English and common sense" compels its conclusion. Ante at 1089. In short, the intent of Congress is clear through the plain language of the statute; that statute requires the Attorney General to make a determination, and that determination is not whether an alien has been convicted of a particularly serious crime, but rather whether that alien constitutes a danger to the community.[2]
 
 III
 
 69
 We need not proceed further. The statute at issue here is plain on its face: in order to deny withholding of deportation, the alien must have committed a particularly serious crime and the Attorney General must make a determination that the alien constitutes a danger to the community. Because the majority concludes otherwise, I respectfully dissent.
 
 
 70
 Chief Judge ERVIN, and Judges HALL, MURNAGHAN and MICHAEL join this dissent.
 
 
 
 *
 Judge Phillips participated in the proceedings in this case until after the oral argument thereof. However, he took senior status between the date the case was argued and the date it was decided, so he did not participate in its decision. See Local Rule 35(c)
 
 
 [1]
 The relevant parts of the statute, as amended in 1990, are set forth in Part II, infra
 There are also procedural claims which, even if well taken, would not go to the merits of the case.
 
 
 [2]
 The Board of Immigration Appeals also addressed Moreno's argument that the Immigration Judge improperly denied him a continuance. The Board held that because he was statutorily ineligible for a waiver of inadmissibility under 8 U.S.C. Sec. 1182(c), the Immigration Judge properly denied him a continuance
 
 
 [3]
 The legislative history on which counsel would have us rely includes May 10, 1990 and May 17, 1990 letters from Senator Simpson to the United Nations High Commissioner for Refugees (UNHCR); an article by Karl W. Hampe, counsel to the Senate Committee on Foreign Affairs (found in Arnold H. Leibowitz & Lynda S. Zengerle, The Immigration Act of 1990 (Prentice-Hall)); an April 16, 1992 letter from Senator Kennedy to the INS Commissioner and the Director of the Executive Office for Immigration Review; and a May 1, 1990 letter from the UNHCR to Senator Simpson. The Kennedy letter was written almost 15 months after the passage of the 1990 Amendments
 
 
 [4]
 The provisions for withholding contained in the House Bill were the provisions adopted by the Conference Committee and therefore the ones enacted. H.R.Conf.Rep. No. 96-781, 96th Cong., 2d Sess. 20, reprinted in 1980 U.S.C.C.A.N. 160, 161
 
 
 [5]
 In addition to the error we would commit in looking first to sources outside the Convention and Protocol, we note that the Handbook itself states that it "does not deal with questions closely related to the determination of refugee status e.g. the granting of asylum to refugees or the legal treatment of refugees after they have been recognized as such." U.N. High Comm'r for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ch. 1, p 24, at 7 (1979)
 
 
 [6]
 The Board of Immigration Appeals looks to "... the nature of the conviction, the type of sentence imposed, and, most importantly, whether the type of circumstances of the crime indicate that the alien will be a danger to the community. Crimes against persons are more likely to be categorized as 'particularly serious crimes.' " Matter of Frentescu, Interim Decision No. 2906, June 23, 1982, p. 247
 
 
 [7]
 Petitioners raise an additional contention that the interpretation of Sec. 1253(h)(2)(B) which we adopt today violates their rights to due process under the Fifth Amendment because they would be subject to deportation without a hearing or other individualized determination of their deportation status. Although we recognize that aliens do have a liberty interest in not being deported, there is no denial of due process when a hearing is not held, as here, on application which " 'on its face must be denied as a matter of law.' " Martins v. INS, 972 F.2d 657, 662 (5th Cir.1992) (per curiam) (quoting Sanchez-Dominguez v. INS, 780 F.2d 1203, 1206 (5th Cir.1986))
 Moreno also raises an argument that the Immigration Judge improperly denied his request, made at the August 4, 1992 hearing, for a continuance until September 24, 1994. Moreno sought the continuance to provide him with an opportunity to show rehabilitation and also to allow him a chance to achieve seven years of permanent residency in order to qualify for relief under 8 U.S.C. Sec. 1182(c). The Immigration Judge denied the request. A continuance should be granted only when an alien is "eligible for [a] form of relief from deportation for which rehabilitation would be relevant." Matter of Garcia-Reyes, 19 I. & N.Dec. 830, 832 (1988). Even if rehabilitation could be considered, and we do not suggest that that is the case, Moreno was not then eligible for relief because he did not have the seven years of lawful unrelinquished domicile which that section also requires. Therefore, the Board of Immigration Appeals was correct in affirming the Immigration Judge's refusal to grant a continuance.
 
 
 [1]
 The majority seems to infer that five circuit courts (the Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits) have concluded that the meaning of the language in Sec. 1253(h)(2) is plain and unambiguous. See ante at 1088-89. This inference is misleading. Indeed, the Tenth Circuit stated in Al-Salehi that "courts generally have recognized that the linguistic structure of Sec. 1253(h)(2)(B) precludes an unequivocal, conclusive interpretation based on language alone." Al-Salehi, 47 F.3d at 393 (citing Martins, Ramirez-Ramos, and Mosquera-Perez); see also Mosquera-Perez, 3 F.3d at 555-59 (language of the statute is ambiguous, but BIA's interpretation reasonable). Furthermore, the Fifth, Seventh, and Ninth Circuits have simply deferred to the BIA's interpretation, see Garcia, 7 F.3d at 1323-26 (holding BIA's interpretation is entitled to deference based on language and legislative history); Martins, 972 F.2d at 661 (affirming BIA's interpretation based on legislative history); Ramirez-Ramos, 814 F.2d at 1397 (holding BIA's interpretation "reasonable" upon "[a] close reading of the language"). The Eleventh Circuit has not deferred to the BIA's interpretation; rather it has held that the plain language of Sec. 1253(h)(2) states a cause and effect, see Arauz, 845 F.2d at 275; Zardui-Quintana, 768 F.2d at 1222 (Vance, J. concurring)
 
 
 [2]
 It is also worth noting that the Supreme Court, albeit in dicta, has stated that Sec. 1253(h)(2) applies when the "alien was convicted of 'serious crime' and 'constitutes a danger to the community of the United States.' " INS v. Cardoza Fonseca, 480 U.S. 421, 444 n. 28, 107 S.Ct. 1207, 1219 n. 28, 94 L.Ed.2d 434 (1987) (emphasis added). Although not binding, this at least demonstrates the Court's understanding of the provision after its consideration of Sec. 1253(h)(2)