# In re Q-T-M-T-, Respondent

*Decided December 23, 1996*

## U.S. Department of Justice
## Executive Office for Immigration Review
## Board of Immigration Appeals

(1) Under section 243(h)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h)(2) (1994), an alien convicted of an aggravated felony is considered to have committed a particularly serious crime, which bars the alien from applying for withholding of deportation under section 243(h)(1) of the Act ("aggravated felony bar").

(2) Under section 243(h)(3) of the Act (to be codified at 8 U.S.C. § 1253(h)(3)), as enacted by section 413(f) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (enacted Apr. 24, 1996) ("AEDPA"), the Attorney General may apply section 243(h)(1) of the Act to any alien, notwithstanding any other provision of law, if she determines in her discretion that it is necessary to do so "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees," Jan. 31, 1967, 1968 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol").

(3) Section 243(h)(3) of the Act did not repeal the aggravated felony bar directly or by implication, but amended it to the limited extent necessary to ensure that refoulement of a particular criminal alien would not place compliance with the Protocol in jeopardy.

(4) Under the provisions of section 305(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-597 (effective Apr. 1, 1997) ("IIRIRA"), an alien convicted of one or more aggravated felonies for which the aggregate sentence is at least 5 years is considered to have committed a particularly serious crime, which bars the alien from eligibility for withholding of removal.

(5) In cases governed by the provisions of section 243(h) of the Act, the standards for determining whether the deportation of an alien convicted of an aggravated felony, as defined in the AEDPA, must be withheld under section 243(h)(1) in order to ensure compliance with the Protocol should not be inconsistent with the relevant provisions of the IIRIRA.

(6) For purposes of applying section 243(h) of the Act, an alien who has been convicted of an aggravated felony, as defined in the AEDPA, and sentenced to an aggregate of at least 5 years' imprisonment, is deemed conclusively barred from relief under section 243(h)(1), and such ineligibility is in compliance with the Protocol.

(7) For purposes of applying section 243(h) of the Act, an alien convicted of an aggravated felony, as defined in the AEDPA, who has been sentenced to less than 5 years' imprisonment, is subject to a rebuttable presumption that he or she has been convicted of a particularly serious crime, which bars eligibility for relief under section 243(h)(1) of the Act.

(8) For purposes of applying section 243(h) of the Act, in determining whether or not a particular aggravated felon, as defined in the AEDPA, who has not been sentenced to at least 5 years' imprisonment, has overcome the presumption that he or she has committed a

particularly serious crime, consistent with the meaning of that term in the Protocol, the appropriate standard is whether there is any unusual aspect of the alien's particular aggravated felony conviction that convincingly evidences that the crime cannot rationally be deemed "particularly serious" in light of treaty obligations under the Protocol.

(9) Although the respondent's convictions for "illicit trafficking in firearms" fall within the aggravated felony definition of the AEDPA and he has been sentenced to less than 5 years' imprisonment, the nature and circumstances of the convictions are such that overriding the aggravated felony bar in this case is not necessary to ensure the United States' compliance with the Protocol.

FOR RESPONDENT: R. Travis Douglas, Esquire, Fort Smith, Arkansas

AMICUS CURIAE FOR AILA: Amy Marmer Nice, Esquire, Washington, D.C.[1]

AMICUS CURIAE FOR FAIR: Timothy J. Cooney, Esquire, Washington, D.C.[1]

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Richard J. Averwater, Assistant District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring and Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

In a decision issued on March 6, 1996, an Immigration Judge found the respondent deportable and statutorily ineligible for asylum and withholding of deportation. The respondent, through counsel, has timely appealed from that decision, challenging only the Immigration Judge's determination that his "aggravated felony" conviction necessarily constitutes a conviction for a "particularly serious crime," thus barring the respondent from establishing eligibility for withholding of deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 243(h) (1994). We find that the respondent has been finally convicted of a "particularly serious crime" and is ineligible for withholding of deportation. Accordingly, the appeal will be dismissed.

## I. BACKGROUND

The respondent is a 23-year-old native and citizen of Vietnam who entered the United States as an immigrant on or about March 13, 1991. On September 27, 1994, the respondent was convicted, in the United States District Court for the Northern District of Georgia, of, inter alia, conspiracy to deal in firearms without a license in violation of 18 U.S.C. §§ 371 and 922(a)(1)(A) (1994) and 26 U.S.C. §§ 5812 and 5861(e) (1994). He was sentenced to a term of imprisonment of 36 months for this offense.

---

[1] The Board acknowledges with appreciation the brief submitted by amicus curiae.

## A. Proceedings Below

Following the March 6, 1996, deportation hearing, the Immigration Judge concluded that the respondent was deportable under section 241(a)(2)(A)(iii) of the Act, 8 U.S.C. § 1251(a)(2)(A)(iii) (1994), as an alien who at any time after entry into the United States has been convicted of an "aggravated felony," as defined in section 101(a)(43) of the Act, 8 U.S.C. § 1101(a)(43) (1994).[2] The respondent thereupon applied for asylum and withholding of deportation under sections 208(a) and 243(h)(1) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h)(1) (1994).

The Immigration Judge properly held that the respondent, by virtue of his final conviction in the United States of an "aggravated felony," was statutorily ineligible for asylum. *See* section 208(d) of the Act ("An alien who has been convicted of an aggravated felony . . . may not apply for or be granted asylum."). Further, and more importantly for purposes of this appeal, the Immigration Judge held that under section 243(h)(2) of the Act, the respondent's aggravated felony conviction constituted a conviction for a "particularly serious crime," barring the respondent from establishing eligibility for withholding of deportation.

## B. Statutory Provisions

At the time of the March 1996 hearing before the Immigration Judge, section 243(h) of the Act provided in pertinent part:

> (1) The Attorney General shall not deport or return any alien (other than an alien described in section 241(a)(4)(D)) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
>
> (2) Paragraph (1) shall not apply to any alien if the Attorney General determines that —
>
> . . .
>
>     (B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States . . . .
>
> For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

On April 24, 1996, however, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (enacted Apr. 24, 1996) ("AEDPA"), which contained an array of provisions pertaining to alien terrorists and criminal aliens. Section 413(f) of the AEDPA, 110 Stat. at 1269, amended section 243(h) of the Act to include the following provision:

---

[2] The Immigration Judge did not address the additional lodged charge of deportability under section 241(a)(2)(C) of the Act.

(3) *Notwithstanding any other provision of law*, paragraph (1) shall apply to any alien if the Attorney General determines, *in the discretion of the Attorney General*, that—

(A) such alien's life or freedom would be threatened, in the country to which such alien would be deported or returned, on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) *the application of paragraph (1) to such alien is necessary to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees.*

(Emphasis added.) In section 413(g) of the AEDPA, 110 Stat. at 1269-70, Congress specified, "The amendments made by this section *shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.*" (Emphasis added.)

Inasmuch as the respondent's application for withholding of deportation has not been finally adjudicated, section 243(h) of the Act, as amended to include section 243(h)(3), applies to his application.

We note that subsequent to the filing of the appeal in this case, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"). This more recent statute provides that the restrictions on the removal of an alien to a country where the alien's life or freedom would be threatened do not apply to an alien who "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." IIRIRA § 305(a), 110 Stat. at 3009-597 (to be codified as section 241(b)(3)(B)(ii) of the Act at 8 U.S.C. § 1251(b)(3)(B)(ii)). It further provides:

For the purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) *for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years* shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

*Id*. (Emphasis added). These provisions do not become effective until April 1, 1997, and thus do not govern the respondent's case. *See* IIRIRA § 309(a), 110 Stat. at 3009-625. However, although not directly applicable to the case at hand, this new law does provide some guidance for our interpretation of the amendment to section 243(h) enacted in the AEDPA.

## II.  ISSUES PRESENTED

The principal issues in this case are raised by the amendment of the Immigration and Nationality Act effectuated by section 413(f) of the AEDPA, 110 Stat. at 1269 (to be codified as section 243(h)(3) of the Act at 8 U.S.C. § 1253(h)(3)). The enactment of section 243(h)(3) has again caused to be raised the question whether restrictions by Congress and the Attorney General on eligibility for withholding of the deportation of an alien convicted of an "aggravated felony" comport with the nonrefoulement provisions of

Article 33 of the United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. ("Convention"), to which the United States is bound by its accession in 1968 to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol").

Thus, we must initially decide whether the enactment of section 243(h)(3) effectively superseded the "aggravated felony" bar to eligibility for withholding of deportation in section 243(h)(2) of the Act. And, we must decide how one determines whether an alien, who has been convicted of an "aggravated felony" and who would otherwise be subject to a statutory bar to withholding under section 243(h)(2) of the Act, nonetheless must have his or her deportation withheld "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." Section 243(h)(3) of the Act.

## III. PRINCIPAL CONTENTIONS ON APPEAL

To aid our consideration of the novel issues raised in this matter, we requested and received briefs from the respondent and the Immigration and Naturalization Service, as well as amicus curiae briefs from the American Immigration Lawyers Association ("AILA") and the Federation for American Immigration Reform ("FAIR").

The respondent, in his supplementary brief, does not dispute the Immigration Judge's determination that the crime of which he was convicted is an aggravated felony under section 101(a)(43)(C) of the Act. Rather, he essentially argues that section 243(h)(3) effectively supersedes the categorical bar to withholding of deportation for aliens convicted of an aggravated felony. The respondent contends that, under the law as amended by section 413(f) of the AEDPA, 110 Stat. at 1269, he is entitled to an individualized determination as to whether his nonreturn or nonrefoulement to Vietnam "is necessary to ensure compliance with the . . . Protocol." Section 243(h)(3)(B) of the Act.

AILA, in its amicus brief, generally supports this reading of the amendment. AILA maintains that the absolute bar to withholding of deportation for aliens convicted of aggravated felonies is inconsistent with Article 33 of the Convention and, consequently, the Protocol. According to AILA, the plain language of section 243(h)(3) reflects congressional intent to "void" the aggravated felony bar. AILA asserts that, in any case, the new provision would render a continued absolute aggravated felony bar to withholding of deportation inconsistent with the United States' treaty obligations under the Protocol because the Protocol requires individualized determinations of not only the seriousness of and specific circumstances underlying the offense at issue, but also the danger the alien presently poses to the community.

The Service, for its part, states that "[o]n its face," section 243(h)(3) "would appear to provide the Attorney General with authority to void 'any provision of law,' including the aggravated felony bar to withholding of

deportation, if she determines that failure to do so would result in a breach of our obligations under the 1967 Protocol." According to the Service, then, "the applicability of section 243(h)(3) to [the] respondent's case turns on an evaluation by the Attorney General of the consistency of the withholding of deportation provisions . . . with [the United States'] obligations under the 1967 Protocol."

The Service argues that the relevant aggravated felony bar to withholding of deportation is consistent with the country's obligations under the Protocol, and that Congress, by not expressly repealing the bar, manifested its view that the bar is not contrary to the dictates of the Protocol. In support of this argument, the Service emphasizes that the Attorney General, presumably aware of the United States' obligations under the Protocol, promulgated a regulation in January 1995, 8 C.F.R. § 208.16(c)(2)(ii), applying the language of the aggravated felony bar to withholding of deportation. The Service further maintains that crimes suggested by the UNHCR Handbook "as potentially 'serious' enough to warrant a denial of refugee protection . . . are largely consistent with those identified as aggravated felonies by the United States." *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva 1992) ("*Handbook*").

Amicus FAIR generally supports the Service's position. FAIR submits that the aggravated felony bar to withholding of deportation is "not affected" by the new section 243(h)(3) "except under rare and unlikely circumstances." Noting that repeals of statutes by implication are not favored, FAIR argues that the "notwithstanding any other provision of law" language of section 243(h)(3) does not serve to repeal or amend any provision of section 243(h)(2), including the aggravated felony bar. According to FAIR, however, section 243(h)(3) allows for the rare possibility that the Attorney General may determine in her discretion that the deportation or return of a particular alien would run afoul of the Protocol.

## IV. DISCUSSION

It is clear from the varied interpretations proposed by the parties and amici that the intended scope and meaning of section 243(h)(3) are subject to significant dispute. We also note that we have not been directed to any analogous statutory framework involving a seemingly absolute proscription in one section of law, but discretionary authority for an administrative determination that the proscription could result in a violation of this country's treaty obligations.

Before we undertake to construe the specific language of section 243(h)(3), we will first briefly review the origin and legislative and administrative history of the withholding of deportation provisions of the Act.

## A. Abbreviated Legislative and Administrative
## History of Section 243(h) Prior to the AEDPA

In 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees. The Protocol bound its parties to the substantive provisions of Articles 2 through 34, inclusive, of the United Nations Convention Relating to the Status of Refugees.[3] To bring United States refugee law into conformance with the country's obligations under the Protocol, Congress enacted the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which established the basic framework for current refugee law. *See generally INS v. Cardoza-Fonseca*, 480 U.S. 429, 436-37 (1987); *INS v. Stevic*, 467 U.S. 407, 418, 421 (1984); *Mosquera-Perez v. INS*, 3 F.3d 553, 556-57 (1st Cir. 1993).

In passing the Refugee Act of 1980, Congress incorporated into the Immigration and Nationality Act the nondiscretionary withholding of deportation provisions of section 243(h). These provisions, set forth above, closely parallel the mandatory nonrefoulement obligations of Article 33 of the Convention. Article 33 of the Convention provides:

> 1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

> 2. The benefit of the present provision may not, however, be claimed by a refugee for whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, *or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country.*

19 U.S.T. at 6276 (emphasis added).

As is clear from the underscored provisions, the language of section 243(h)(2)(B), which erects a mandatory bar to withholding of deportation, or nonrefoulement, to any "alien [who], having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States," mirrors the language of Article 33.2 of the Convention. Indeed, as AILA notes in its amicus brief, the report of the Joint Conference Committee considering the final bill leading to the Refugee Act of 1980 indicates that the conferees adopted the language of section 243(h)(2)(B) "with the understanding" that it "is based directly upon the language of the Protocol" and that the conferees "intended that the provision be construed consistent with the Protocol." H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 160, 161.

In 1982, this Board first set forth criteria for determining whether a crime was "particularly serious" for purposes of section 243(h)(2)(B) in our decision in *Matter of Frentescu*, 18 I&N Dec. 244 (BIA 1982), modified, *Matter of C-*, 20 I&N Dec. 529 (BIA 1992), *Matter of Gonzalez,* 19 I&N Dec. 682

---

[3] The United States is not a signatory to the Convention.

(BIA 1988).  In doing so, we did not endeavor to establish an exact, conclusive definition of "particularly serious crime," as no such definition was provided in the Protocol or the Act.  Rather, we concluded that while certain crimes are inherently "particularly serious crimes," "the record in most proceedings will have to be analyzed on a case-by-case basis." *Id*. at 247. We stated:

> In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.  Crimes against persons are more likely to be categorized as "particularly serious crimes."  Nevertheless, we recognize that there may be instances where crimes (or a crime) against property will be considered as such crimes.

*Id*.; *see also Matter of C-, supra*, at 533-35 & n.3 (BIA 1992); *Matter of B-*, 20 I&N Dec. 427 (BIA 1991); *Matter of K-,* 20 I&N Dec. 418 (BIA 1991), *aff'd, Kofa v. INS*, 60 F.3d 1084 (4th Cir. 1995); *Matter of U-M-*, 20 I&N Dec. 327 (BIA 1991), *aff'd, Urbina-Mauricio v. INS*, 989 F.2d 1085 (9th Cir. 1993), *modified, Matter of C-, supra, clarified, Matter of K-, supra; Matter of Carballe*, 19 I&N Dec. 357, 360-61 (BIA 1986), *modified, Matter of C-, supra, clarified, Matter of K-, supra, modified on other grounds, Matter of Gonzalez, supra.*

Subsequent to *Matter of Frentescu, supra*, in *Matter of Carballe, supra*, we construed section 243(h)(2)(B) to provide that once an alien's crime is determined to be "particularly serious," it necessarily follows that the alien is a "danger to the community." We held that the language of the statute and Article 33.2 of the Convention did not require "a separate determination of dangerousness focusing on the likelihood of future serious misconduct on the part of the alien." *Id*. at 360.  We also held, in *Matter of Rodriguez-Coto*, 19 I&N Dec. 208, 209-10 (BIA 1985), *modified on other grounds, Matter of Gonzalez, supra*, that the statutory language of section 243(h)(2)(B) did not require a balancing of the seriousness of the crime against the nature or severity of the potential persecution the alien might face if returned to his or her country of origin.

Congress, in enacting section 515(a)(2) of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5053 (the "1990 Act"), "obviated the *Frentescu* analysis for aggravated felonies by appending the following paragraph" to section 243(h)(2):

> For purposes of subparagraph (B), an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime.

*Mosquera-Perez v. INS, supra,* at 557.

Following the enactment of this "aggravated felony bar" to withholding of deportation, we have continued to construe the provisions of section 243(h)(2) as not requiring a separate determination of danger to the community, irrespective of whether the alien was convicted of an aggravated felony. *See Matter of C-, supra; Matter of K-, supra; Matter of U-M-, supra.* Our

construction of section 243(h)(2)(B) and the 1990 "aggravated felony bar" provision has been sustained in every reviewing court faced with the issue. *See Hamama v. INS*, 78 F.3d 233, 240 (6th Cir. 1996); *Ahmetovic v. INS*, 62 F.3d 48, 52-53 (2d Cir. 1995); *Kofa v. INS, supra*, at 1088-91; *Al-Salehi v. INS*, 47 F.3d 390, 393-96 (10th Cir. 1995); *Feroz v. INS*, 22 F.3d 225, 227 (9th Cir. 1994); *Garcia v. INS*, 7 F.3d 1320, 1323-27 (7th Cir. 1993); *Mosquera-Perez v. INS, supra*, at 558-59; *Martins v. INS*, 972 F.2d 657, 660-62 (5th Cir. 1992); *Ramirez-Ramos v. INS*, 814 F.2d 1394, 1397 (9th Cir. 1987); *Crespo-Gomez v. Richard*, 780 F.2d 932, 934-35 (11th Cir. 1986).

In the case before us, however, we must ascertain whether the amendments to section 243(h), brought about by section 413(f) of the AEDPA, affect our analysis under section 243(h)(2)(B) as it applies to the respondent and, if so, to what extent. Most importantly for purposes of this appeal, we must initially decide whether the aggravated felony bar to withholding of deportation, in place between the effective date of the AEDPA and the effective date of the IIRIRA, has been effectively "voided" by section 243(h)(3), as the respondent and AILA contend.

## B. Intended Scope and Meaning of Section 243(h)(3)

"In construing statutes, 'we must, of course, start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)); *see also INS v. Cardoza-Fonseca, supra,* at 432 n.12 (noting that there is a "strong presumption that Congress expresses its intent through the language it chooses"). Here, Congress has introduced section 243(h)(3) with the sweeping phrase, "[n]otwithstanding any other provision of law." Section 243(h)(3) of the Act. Also, on its face, the statute grants the Attorney General broad discretion to determine whether the return or deportation of "any alien" would violate the Protocol. *Id*.

When interpreting the phrase "notwithstanding any other provision of law," the United States Court of Appeals for the District of Columbia remarked that "'[a] clearer statement is difficult to imagine.'" *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (quoting *Crowley Caribbean Transport, Inc. v. United States,* 865 F.2d 1281, 1283 (D.C. Cir. 1989) (quoting *Illinois Nat'l Guard v. Federal Labor Relations Authority,* 854 F.2d 1396, 1403 (D.C. Cir. 1988)). *But see In Re Glacier Bay*, 944 F.2d 577, 582 (9th Cir. 1991) (finding "notwithstanding" phrase not dispositive of whether Congress intended to repeal another statute, particularly where there is manifest legislative intent to the contrary). The markedly broad and sweeping phrases "notwithstanding any other provision of law" and "any alien" indicate that Congress intended the provision to allow the Attorney General to override any statutory bar or other preclusion to the protection afforded by section 243(h)(1) in any case she deems in her discretion

to warrant such an extraordinary action to ensure compliance with the Protocol.

On the other hand, Congress did not expressly repeal the aggravated felony bar to withholding of deportation. We cannot conclude that Congress' failure to repeal this provision was unintentional. Moreover, we would not lightly undertake to conclude that Congress impliedly intended to repeal this provision, for it is "'a cardinal principle of statutory construction'" that repeals by implication are not favored. *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154 (1976) (quoting *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168 (1976)); *see also Morton v. Mancari*, 417 U.S. 535, 549-51 (1974); *United States v. Joya-Martinez,* 947 F.2d 1141, 1144 (4th Cir. 1991); *Patel v. Quality Inn South,* 846 F.2d 700, 704 (11th Cir. 1988), *cert. denied*, 489 U.S. 1011 (1989). As the Supreme Court has stated: "'Repeal is to be regarded as implied only if necessary to make the [later enacted provision] work, and even then only to the minimum extent necessary.'" *Radzanower v. Touche Ross & Co., supra,* at 155 (quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 357 (1963)).

A repeal by implication will be recognized only if there is an "'irreconcilable conflict'" between the earlier and later statutes or "'if the later act covers the whole subject of the earlier one and is clearly intended as a substitute,'" but, in either case, Congress' intention to repeal the earlier law must be "'clear and manifest.'" *Radzanower v. Touche Ross & Co., supra,* at 154 (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503 (1936)); *see also Rodriguez v. United States*, 480 U.S. 522, 524 (1987); *Patel v. Quality Inn South, supra*. Accordingly, we will seek to construe sections 243(h)(2)(B) and (3) to give effect to each while preserving the sense and purpose of both provisions. *See Morton v. Mancari, supra,* at 551 ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Reviewing what Congress did and did not say in this provision and applying the above-mentioned guidelines for statutory construction, we find it apparent that Congress sought to amend the aggravated felony bar only to the limited extent necessary to ensure that the refoulement of a particular criminal alien would not place our compliance with the Protocol in jeopardy. In our view, the amendment was intended to have a limited effect, rather than to work a wholesale repeal of existing laws governing criminal aliens' eligibility for withholding of deportation.[4]

---

[4] This construction of section 243(h)(3) is supported by its very sparse legislative history. The legislative history behind section 243(h)(3) is virtually nonexistent because it was added as an amendment to the AEDPA bill at the late Conference stage and, accordingly, was not included in either the House or Senate Reports. However, Senator Edward Kennedy proposed a

With this in mind, we turn to the question of how one determines whether an alien, who has been convicted of an "aggravated felony" and who would otherwise be subject to a statutory bar to withholding under section 243(h)(2) of the Act, nonetheless must have his or her deportation withheld "to ensure compliance with the 1967 United Nations Protocol Relating to the Status of Refugees." Section 243(h)(3) of the Act.

## C. Exercise of Discretionary Authority Under Section 243(h)(3)

### 1. Position of Respondent and AILA

The respondent concedes that he has been convicted of an aggravated felony. The respondent and AILA argue, however, that the Protocol, incorporating Article 33 of the Convention, mandates an individualized "*Frentescu* analysis" for each and every crime no matter how serious it is on its face. According to the respondent and AILA, therefore, the effect of section 243(h)(3) must be to proscribe any categorical bar to withholding of deportation, including the aggravated felony bar that has been in place since 1990. We disagree.

As we noted in *Matter of Frentescu, supra,* neither the Protocol nor the Convention specifically defines or offers guidance as to what constitutes a "particularly serious crime."[5] *Id*. at 246. In *Frentescu*, we also consulted the UNHCR *Handbook* (Geneva 1979). We concluded, however, that the

---

similar amendment to another immigration bill, S. 1664, 104th Cong., 2d Sess. 159 (1996), that was under consideration by Congress contemporaneously with the AEDPA bill.  In introducing the amendment to the Senate Committee on the Judiciary on March 20, 1996, Senator Kennedy stated that the per se aggravated felony bar to withholding of deportation at section 243(h)(2) of the Act "has not been in conflict with our treaty obligations." *Immigration Control and Financial Responsibility Act of 1996: Mark-up on S. 1664 before the Senate Committee on the Judiciary,* 104th Cong., 2d Sess. 60-61 (1996). Senator Kennedy, however, expressed his concern that the further expansion of the definition of "aggravated felony" included in section 161 of S. 1664 would encompass "fairly minor offenses" he did not consider to be per se "particularly serious crimes." *Id*.

We are mindful of the Supreme Court's cautionary note that "ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill, let alone a separate but related bill, are not controlling in analyzing legislative history." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 (1980).  In this instance, however, given the dearth of legislative history and the fact that Senator Kennedy's amendment, which was adopted as proposed in S. 1664, is virtually identical to section 243(h)(3), his statements before the Senate Judiciary Committee provide some "reliable indication as to congressional intention." *Id*. at 118-19.

[5] The Handbook provides some guidance as to what constitutes a "serious non-political crime," a distinct term employed in Article 1F of the Convention:

What constitutes a "serious" non-political crime for the purposes of this exclusion clause is difficult to define, especially since the term "crime" has different connotations in different legal systems . . . . In the present context, however, a "serious" crime must be a capital crime or a very grave punishable act. Minor offenses punishable by moderate sentences are

*Handbook* offered little counsel on this specific issue. *Id.; see also Garcia v. INS, supra* (observing that the *Handbook's* "general statements . . . do not help greatly with the interpretation of Article 33(2)"). Ultimately, as one commentator observed, "what a 'particularly serious crime' is will depend on the interpretation of these words in the various [contracting] states, in accordance with their Criminal Code." N. Robinson, *Convention Relating to the Status of Refugees: Its History, Contents and Interpretation* 164 n.277 (Institute of Jewish Affairs 1953).

In the absence of guidance from Congress or the international instruments giving rise to the withholding of deportation provisions of the Act, we set forth the "*Frentescu* analysis," outlined above, for ascertaining whether a crime in question is "particularly serious." *Matter of Frentescu, supra*. At that time, we specifically held, however, that certain crimes are "particularly serious" on their face, obviating the necessity for consideration of the various *Frentescu* factors. *Id. See generally Ahmetovic v. INS, supra*, at 52 (observing that "[o]nly where there is room for disagreement as to whether the crime in question was 'particularly serious' should the Board resort to examining [the *Frentescu* factors]").

Indeed, both before and after Congress' enactment of the aggravated felony bar in 1990, a consistent practice of this Board has been to classify certain crimes as per se "particularly serious crimes" on their face without proceeding to an individualized examination of the *Frentescu* factors. *See, e.g., Matter of Gonzalez, supra*, at 683-84 (holding that drug trafficking crimes are per se "particularly serious"); *Matter of Carballe, supra*, at 360-61 (same—armed robbery and attempted armed robbery); *Matter of Garcia-Garrocho,* 19 I&N Dec. 423, 425-26 (BIA 1986) (same—burglary involving a dangerous weapon or resulting in physical injury to a victim). This practice has been upheld by several reviewing courts. *See, e.g., Hamama v. INS, supra*, at 240 (upholding the Board's determination that felonious assault involving the use of a dangerous weapon is per se "particularly serious" and noting that the Board "has the prerogative to declare a crime particularly serious without examining each and every *Frentescu*

---

not grounds for exclusion under Article 1F(b) even if technically referred to as "crimes" in the penal law of the country concerned.

*Handbook, supra,* para. 155, at 36 (emphasis added); *see also Matter of Frentescu, supra; Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 468 (BIA 1980). Article 1(F) of the Convention states in pertinent part: "The provisions of this Convention shall not apply to any person with respect to whom there are serious reasons for considering that: . . . (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee . . . ." In any case, the *Handbook* is advisory in nature and does not have the force of law. *See INS v. Cardoza-Fonseca, supra*, at 438-39 & n.22 (advising that while the *Handbook* does not have the force of law, it does provide "significant guidance in construing the Protocol"); *Kofa v. INS, supra*, at 1090 & n.5; *Garcia v. INS, supra*, at 1325; *Ramirez-Ramos v. INS, supra*, at 1397-98.

factor"); *Ahmetovic v. INS, supra*, at 52 (sustaining the Board's determination that first-degree manslaughter is a "particularly serious crime" per se). *But see Beltran-Zavala v. INS*, 912 F.2d 1027 (9th Cir. 1990) (questioning, in a case arising prior to enactment of the aggravated felony bar of section 243(h)(2), the Board's authority to delimit classes of per se "particularly serious crimes" in the absence of congressional imprimatur).

In 1990, Congress exercised its plenary authority over immigration law and erected a per se categorical bar to withholding of deportation for any alien convicted of an aggravated felony. Section 243(h)(2) was amended to specifically provide that "an alien who has been convicted of an aggravated felony shall be considered to have committed a particularly serious crime." Section 515(a)(2) of the 1990 Act, 104 Stat. at 5053. Neither the Convention nor the Protocol prohibits a contracting state from establishing a category of intrinsically "particularly serious crimes." Moreover, no court has ruled that Congress' categorization of per se "particularly serious crimes" is impermissible under the Protocol or constitutes a tacit abrogation of the treaty. *See, e.g., Garcia v. INS, supra*, at 1326 (commenting, in dicta, that "Congress' intention [in section 243(h)(2)(B) of the Act] to increase the number of crimes that automatically bar eligibility for relief can scarcely be questioned").

In support of its argument that a categorical bar to withholding of deportation runs afoul of the United States' nonrefoulement obligations under Article 33 of the Convention, AILA has presented an advisory letter from the UNHCR Representative to the United States, Mr. Anne Willem Bijleveld. Mr. Bijleved states: "It is the opinion of UNHCR that a Contracting State which automatically bars an individual convicted of an 'aggravated felony' from withholding of deportation is in violation of the 1967 Protocol relating to the Status of Refugees." AILA urges our reliance upon this opinion. The UNHCR's opinion, however, while meriting serious consideration, does not rise to the level of international law and principally relies upon passages of the *Handbook* as its foundation.

Moreover, were we to rely upon UNHCR's opinion and therefore accept the respondent's position that a categorical classification of per se "particularly serious crimes" contravenes Article 33 of the Convention, we would be essentially ruling that the United States has been in violation of the Protocol since 1990 when Congress first established the aggravated felony bar of section 243(h)(2) of the Act. In addition, such a ruling would be in conflict with the amendment to the law enacted in the IIRIRA, which categorically bars from withholding relief any alien "convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years." IIRIRA § 305(a). Thus, we do not accept the position that categorical classifications of crimes as per se "particularly serious crimes" necessarily places the United States out of compliance with the Protocol.

## 2. Positions of INS and FAIR

The Service agrees that the AEDPA did not intend to or effectively void the aggravated felony provision of section 243(h)(2). The Service notes that the Administration recommended the enactment of section 243(h)(3) in the AEDPA because of the *expansion* of the categories of crimes within the aggravated felony definition by the AEDPA. Thus, the Service argues in part that only the "expanded" aggravated felony grounds added by the AEDPA should be considered on a case-by-case basis under section 243(h)(3). While this may have been the Administration's intent in recommending the adoption of this provision, there are no implementing regulations to that effect, and the broad language of section 243(h)(3) is not limited to the newly categorized aggravated felonies in the AEDPA.

FAIR submits the following contention:

> [T]he Board of Immigration Appeals should rule that the phrase "notwithstanding any other provision of law" in Section 413(f) of the AEDPA does not void the aggravated felony bar to withholding of deportation relief under Section 243(h)(2)(B) of the INA, except in the very unlikely event that the Attorney General has exercised her discretion to examine whether a particular aggravate felony constitutes "a particularly serious crime" within the meaning of Article 33 of the 1951 United Nations Convention Relating to the Status of Refugees and has determined that it does not.

However, while we agree with this general principle, specific guidance is not offered as to the standard to determine whether the treatment of a *particular* aggravated felony as a particularly serious crime would take this country out of compliance with the Protocol.

## 3. Congressional Guidance

Congress has plenary authority under the Constitution to enact implementing legislation which defines the United States' obligations under a non-self-executing international treaty to which the country is a signatory. *See, e.g., INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984); *United States v. Aguilar*, 883 F.2d 662, 680 (9th Cir. 1989), *cert. denied*, 498 U.S. 1046 (1991); *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 936-39 (D.C. Cir. 1988). Moreover, the United States, acting through the legislative process, committed to Congress and the Executive, has the authority to designate and define crimes that it deems "particularly serious" in view of the domestic problems facing the country. *See generally INS v. Chadha*, 462 U.S. 919 (1983) (clarifying the separation of powers under the Constitution); *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (same).

In other words, we do not construe the concept of a "particularly serious crime" to have a fixed meaning in international or domestic law. Absent a binding international meaning to the phrase "particularly serious crime," Congress is free to expand or contract the construction to be given that phrase by United States asylum adjudicators. In this respect, no past or present

definition enacted by Congress can be said to have, per se, violated international law. Congress can simply change its approach without such a modification necessarily calling into question the "legality" of its past enactments under international law. Similarly, Congress is also free to entrust, or to delegate, an individual case-by-case determination of what constitutes a "particularly serious crime" to United States officials such as the President or the Attorney General.

Under the AEDPA, Congress seemingly has done some of each. It has enacted its own construction; and it has delegated to the Attorney General the responsibility of making her own discretionary determination regarding compliance with the Protocol in individual cases. Given the authority of Congress to define the phrase "particularly serious crime" and the absence of a binding international meaning to the phrase "particularly serious crime," it is no easy task to find a separate "measuring stick" against which the Attorney General should assess the application of Congress' definition in any given case controlled by the AEDPA.

However, in exercising the broad discretionary authority accorded to the Attorney General by Congress in the AEDPA, we think it appropriate to look for some guidance to the IIRIRA and the intent of Congress reflected therein. We find it a reasonable exercise of discretion to interpret the amendments to the Immigration and Nationality Act enacted in 1996 by the AEDPA in a manner not inconsistent with the more recent amendments to the same provisions of law by the IIRIRA.

### D. Standards for Ascertaining Whether the Withholding of a Criminal Alien's Deportation is Necessary to Ensure Compliance with the 1967 Protocol

### 1. Standards

Absent further statutory or regulatory guidance, we conclude that the standards for determining whether the withholding of deportation of an alien convicted of an aggravated felony, as defined in the AEDPA, is necessary to ensure compliance with the 1967 Protocol should not be inconsistent with the relevant provisions of the IIRIRA.

In the IIRIRA, for purposes of restricting the removal of an alien to a country where the alien's life or freedom would be threatened, aliens convicted of an aggravated felony are ineligible for such relief if sentenced to an aggregate of at least 5 years' imprisonment. In view of this recent enactment, we conclude as a matter of discretion, for the purposes of applying section 243(h)(3) of the Act, that any alien convicted of an aggravated felony, if sentenced to an aggregate of at least 5 years' imprisonment, is conclusively barred from relief under section 243(h)(1) and that such ineligibility for withholding is in compliance with the Protocol.

Secondly, considering prior congressional enactments and the considerable body of judicial and administrative precedent construing section 243(h) of the Act and the Protocol, we find that an alien convicted of an aggravated felony, as defined in the AEDPA, who has been sentenced to less than 5 years in prison should be presumed to have been convicted of a particularly serious crime, rendering him or her ineligible for relief under section 243(h)(1). Such a presumption is warranted in view of the fact that section 243(h)(2) of the presently controlling law specifies that such aliens "shall be considered to have committed a particularly serious crime." Section 243(h)(2) of the Act. Moreover, the seriousness with which such crimes are viewed is reflected not only in the appellation "aggravated felony," but also by the fact that such aliens are absolutely barred from most forms of relief from deportation, including for asylum under section 208 of the Act. However, we do not find that this presumption is irrebuttable for aliens who have been convicted of an aggravated felony, but not sentenced to at least 5 years' imprisonment.

For purposes of applying section 243(h), in determining whether or not an alien convicted of an aggravated felony, as defined in the AEDPA, who has not been sentenced to at least 5 years' imprisonment, has overcome the presumption that he or she has committed a particularly serious crime, consistent with the meaning of that term in the Protocol, we find the appropriate standard to be whether there is any unusual aspect of the alien's particular aggravated felony conviction that convincingly evidences that his or her crime cannot rationally be deemed "particularly serious" in light of our treaty obligations under the Protocol. To make this determination, we will look to the conviction records and sentencing information in the alien's case. In this analysis, we do not engage in the retrial of the alien's criminal case or go behind the record of conviction to determine his or her innocence or guilt. We look to the nature and circumstances of the crime to determine whether the alien, having been convicted of that crime, can be said to represent a danger to the community of the United States. *See, e.g., Matter of Carballe, supra*, at 360-61; *Matter of Frentescu, supra*. Furthermore, in this examination, one must give significant weight to the decision of Congress to include that particular category of crime in the aggravated felony definition. The domestic problems confronting the United States and the overall level of harm to the community arising from certain forms of criminal conduct are clearly factors within the legislative purview of Congress.

The ultimate question under section 243(h)(3) of the Act is whether the aggravated felony bar in section 243(h)(2), as applied in a particular case, is inconsistent with United States' compliance with the Protocol. In this regard, we recognize that certain categories of crime may encompass conduct which varies significantly in gravity, yet supports a conviction. The essential inquiry in our view is whether classifying the alien's aggravated felony conviction as "particularly serious" is clearly and manifestly inconsistent with

our treaty obligations. Doubts on this score should be resolved in favor of the congressional choice reflected in section 243(h)(2) of the Act.

## 2. Application of Guidelines to the Respondent

Applying these guidelines to the matter at hand, we note the respondent's concession that his "illicit trafficking in firearms" falls with the definition of an aggravated felony. *See* section 101(a)(43)(C) of the Act. As he was not sentenced to at least 5 years' imprisonment, we must further consider the record to determine whether the strong presumption that his crime is particularly serious, thus rendering him ineligible for relief under section 243(h)(1), has been rebutted.

The record of conviction in this case reflects that the respondent was convicted on September 27, 1994, of three separate offenses involving illicit trafficking in firearms: (1) conspiracy to commit offenses against the United States, to wit: to deal in firearms without a license, unlawfully transfer sawed-off shotguns, and traffic in unauthorized access devices (i.e. credit cards), in violation of 18 U.S.C. § 371; (2) dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A); and (3) unlawful transfer of a sawed-off shotgun, in violation of 26 U.S.C. §§ 5812 and 5861(e). He was sentenced to a term of imprisonment of 36 months on each count, to be served concurrently.

The record reflects that the respondent and his co-conspirators, from June to October 1993, conspired to engage in illicit trafficking in numerous firearms, including sawed-off shotguns, and stolen credit cards. In September 1993, the respondent unlawfully sold a 12-gauge, pump sawed-off shotgun to two undercover F.B.I. agents. He also tried to unlawfully sell a 9-mm., semi-automatic pistol to the agents.

The number and depth of the societal problems stemming from the proliferation of unlicensed firearms in the United States are so manifest as to require little elaboration. Having examined the alarming degree of harm suffered by and the imminent danger to the American public resulting from illicit firearms trafficking, Congress designated certain illicit firearms-trafficking violations "aggravated felonies."

Considering these facts, we do not find that overriding the aggravated felony bar in this case is necessary to ensure the United States' compliance with the Protocol. Accordingly, we find on the record before us that this respondent is ineligible for withholding of deportation.

## V. OTHER ISSUES RAISED

In its amicus brief, AILA contends that Article 33 of the Convention mandates that a separate determination of the respondent's danger to the community of the United States must be made before it can be concluded that he is barred from eligibility for withholding of deportation under section

243(h)(2)(B) of the Act. This argument forms the central focus of the dissent. However, we have consistently held that neither the Convention and Protocol nor section 243(h)(2)(B) of the Act requires a separate "dangerousness" determination "focusing on the likelihood of future misconduct on the part of the alien." *Matter of Carballe, supra*, at 360; *see also Matter of K-, supra; Matter of U-M-, supra.* As we noted previously in this decision, every reviewing court reaching the issue has sustained our prior holding in this regard. *See Hamama v. INS, supra; Ahmetovic v. INS, supra; Kofa v. INS, supra; Al-Salehi v. INS, supra; Feroz v. INS, supra; Garcia v. INS, supra; Mosquera-Perez v. INS, supra; Martins v. INS*, 972 F.2d 657 (5th Cir. 1992); *Ramirez-Ramos v. INS, supra; Crespo-Gomez v. Richard, supra.* Indeed, in 1995, the Attorney General issued a regulation adopting this construction of section 243(h)(2)(B). 8 C.F.R. § 208.16(c)(2)(ii) (1995). Moreover, there is nothing in the legislative history of either the AEDPA or the IIRIRA suggesting that Congress had any intent to override this well-settled construction of the law. And, particularly in enacting the IIRIRA, Congress reflected its ability to clearly address and override Board and judicial constructions of the law which it deemed erroneous. Thus, we do not find our ruling on this issue is affected by section 243(h)(3) of the Act.

AILA also submits that the Convention mandates a balancing of the seriousness of the crime with the potential severity of the persecution the alien may face if deported or returned to a particular country before it can be concluded that the alien is barred from eligibility for withholding of deportation under section 243(h)(2)(B). It is now well settled, however, that "[t]he statutory bar to withholding of deportation based on conviction of a particularly serious crime relates only to the nature of the crime and does not vary with the nature of the evidence of persecution." *Matter of K-, supra*, at 426; s*ee also Ramirez-Ramos v. INS, supra*, at 1397-98; *Garcia-Mir v. Smith*, 766 F.2d 1478, 1487 n.10 (11th Cir. 1985), *cert. denied sub nom. Marquez-Medina v. Meese*, 475 U.S. 1022 (1986); *Matter of Garcia-Garrocho, supra; Matter of Rodriguez-Coto, supra.* We do not find our holding in this regard disturbed by section 243(h)(3) of the Act.

## VI. CONCLUSION

Accordingly, for the foregoing reasons, the respondent's appeal will be dismissed.

**ORDER:**     The appeal is dismissed.

*CONCURRING AND DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur that in enacting section 243(h)(3) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1253(h)(3)), Congress did not intend to

repeal section 243(h)(2)(B) of the Act, 8 U.S.C. § 1253(h)(2)(B)(1994), which codifies a narrowly defined exception to our international obligation of nonrefoulement under the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. ("Convention"), and the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268 ("Protocol"),[1] but that Congress was instead amending its application. *See* section 243(h)(2) of the Act (making an exception for persons who constitute a danger to the community); *see also* Articles 32 and 33 of the Convention (prohibiting expulsion and return but allowing a signatory state to invoke an exception to this principle based on concerns related to security, public order, or danger to the community of that country).

In addition, I do not dispute that either Congress or, where Congress has not acted or has delegated its authority, the Attorney General, may determine that certain convictions are for crimes that we consider particularly serious offenses. Certainly, beginning by designating certain types or levels of offenses which we consider to be particularly serious is not necessarily an unreasonable approach.

However, when such a categorical designation is treated as dispositive of whether a refugee poses a danger to the community, thus relieving the United States of our obligation to provide withholding of deportation under section 243(h)(1), it is difficult to see how we satisfy our responsibility to provide individual consideration. I cannot agree that such an interpretation is consistent with an accurate understanding of the terms of either the statute or the international instrument on which it is based.

There is no question that Congress was clearly aware of its international treaty obligations when it first enacted this exception to withholding of deportation. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102; *see also* H.R. Conf. Rep. No. 781, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 160, 161; H.R. Rep. No. 608, 96th Cong., 1st Sess. 1, 6, 17-18 (1979) (stating specifically that Congress' intent was precise compliance with international law as described in the Protocol). Like the majority, I presume that Congress also had no intention of abrogating these obligations when, in the Immigration Act of 1990, Pub. L. No. 100-649, 104 Stat. 4978 ("1990 Act"), it subsequently designated aggravated felonies as being particularly serious crimes, and later expanded the definition of "aggravated felony" to include even a greater number of offenses.

Nonetheless, Congress has significantly amended the statute, and we should account for these changes and reassess our interpretation of the statute

---

[1] The 1967 Protocol, to which the United States is a signatory, applies Articles 2 through 34 of the 1951 Convention to all refugees without regard to the geographic limitation or the other limitations contained in the Convention as to events occurring before 1951. Protocol, *supra*, art. 1, para. 1. As used in this opinion "Protocol" and "Convention" refer equally to the Convention obligations assumed by signatories to the Protocol.

in light of these changes. Indeed, had Congress been satisfied that the current interpretation and application of section 243(h) did comport with our obligations, there would have been little need for any amendments whatsoever. Since Congress has made these changes, not once but twice this calendar year, we should be wary of invoking precedent too quickly.

Congress' most recent amendments of the statute afford us the opportunity to seriously reexamine our interpretation of section 243(h)(2)(B) in relation to the Protocol and our obligations under it. I do not think that the majority has accounted adequately for the fact that the recent revisions emphasize both our international obligations and the Attorney General's discretion. Reading these amendments together, I cannot conclude that a minor adjustment of the status quo either satisfies congressional intent in amending the statute, or is a reasonable interpretation of Congress' overall intent to satisfy our international obligations. Persistence in reading section 243(h)(2)(B) according to our existing construction of the language, despite the statutory changes we are asked to interpret today, might actually place compliance with those treaty obligations at risk.

I disagree that such a limited scheme reasonably effectuates section 243(h)(3) as introduced by Congress in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (enacted Apr. 24, 1996) ("AEDPA"). It simply fails to comport with our international obligations, which are underscored by the express statutory language emphasizing the Attorney General's discretionary role in insuring compliance under domestic law.[2] Consequently I dissent.

## I. STATUTORY AND TREATY INTERPRETATION

Article 32 of the Convention provides that no contracting state may expel a refugee except on grounds of national security or public order. Convention, *supra*, art. 32.1 Should such expulsion occur, it must be "only in pursuance of a decision reached in accordance with due process of law." *Id*. art. 32.2.

Article 33 provides:

Prohibition of expulsion or return
("refoulement")

1. *No Contracting State shall expel or return ("refouler") a refugee in any manner* whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

---

[2] These obligations, inherent in our original accession to the Protocol, preexisted enactment of section 243(h)(3) in the AEDPA and, as discussed *infra*, continue to exist after the replacement of section 243(h)(3), effective April 1, 1997, pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA").

2. *The benefit* of the present provision *may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country* in which he is, *or who*, having been convicted by a final judgement of a particularly serious crime, *constitutes a danger to the community of that country.* (Emphasis added.)

These provisions have been imported to section 243(h) of the Immigration and Nationality Act, which provides:

(1) The Attorney General shall not deport or return any alien . . . to a country *if the Attorney General determines* that [grounds stated in Article 33.1 exist] . . .

(2) [unless]

. . .

(B) the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

. . .

(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States. (Emphasis added.)

## A. Rules of Statutory Interpretation

It is rudimentary that construction of the statutory language begins with the terms of the statute itself, and that if those terms on their face constitute a plain expression of congressional intent, they must be given effect. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1994). Where Congress' intent is not plainly expressed, then we need to determine a reasonable interpretation of the language, and fill any gap left, implicitly or explicitly, by Congress. *Id.* at 843; *COIT Independent Joint Venture v. Federal Sav. and Loan Ins. Corp.* 489 U.S. 561 (1989) (holding that "whole statute" interpretation favors reading statutory sections in harmony to achieve a harmonious whole); *see also K Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 291 (1988) (holding that construction of language which takes into account the design of the statute as a whole is preferred).

In the course of that exercise, we may examine legislative history and employ the panoply of principles of statutory construction, including the principle that in view of the harsh consequences of deportation, ambiguities are to be construed in favor of the alien. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 449 (1987); *Barber v. Gonzales*, 347 U.S. 637, 642 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Matter of Hou*, 20 I&N Dec. 513, 520 (BIA 1992); *Matter of Tiwari*, 19 I&N Dec. 875, 881 (BIA 1989).

The relevant statutory sections, derived from international law, contain both plain and unquestionably ambiguous language. The majority acknowledges that the meaning of the statutory section has been the subject of "significant dispute." Congress' enactment of section 243(h)(3), and the successor provision to section 243(h) in section 305(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-597 ("IIRIRA") (to be codified as section

241(b)(3) of the Act at 8 U.S.C. § 1251(b)(3)), underscore Congress' intent to comply with the Protocol and to delegate to the Attorney General the discretionary authority to do so. This enactment provides a compelling reason to revisit our construction of section 243(h).

## B. Consideration of Treaty Terms

Congress has plenary authority under the Constitution to enact implementing legislation which defines the United States' obligations under a non-self-executing international treaty to which the country is a signatory. *See, e.g., INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984); *United States v. Aguilar,* 883 F.2d 662, 680 (9th Cir. 1989), *cert. denied*, 498 U.S. 1046 (1991); *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 936-39 (D.C. Cir. 1988). It is well settled that the terms of our treaty obligations are of equal force as the terms of domestic statutes. *See, e.g., Whitney v. Robertson,* 124 U.S. 190, 194 (1888).

Courts must strive to interpret domestic legislation in a way that is consistent with international obligations. *See, e.g., Weinburger v. Rossi*, 456 U.S. 25, 32 (1982); *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). This could not be more pertinent a principle than it is in the construction now before us, as, "[i]f one thing is clear from the legislative history of the new definition of 'refugee,' and indeed the entire 1980 Act, it is that one of Congress' primary purposes was to bring United States refugee law into conformance with the [Protocol]." *INS v. Cardoza-Fonseca, supra*, at 436 (1987).[3]

Domestic law may supersede international obligations only by express abrogation, *Chew Heong v. United States*, 112 U.S. 536, 538 (1884), or by subsequent legislation that irrevocably conflicts with international obligations, *Reid v. Covert*, 354 U.S. 1, 18 (1957). However, that principle has no application here. In this instance, Congress has not expressed any intention of reneging on the international obligations assumed through accession to the 1967 Protocol via the Refugee Act of 1980, nor has Congress articulated any desire to curtail refugee protections beyond the limitations set out in the Protocol.

To the contrary, twice in 1996, Congress has addressed the statutory sections which articulate and govern implementation of these obligations and has even literally emphasized its concern that the Attorney General have discretion to act in compliance with the Protocol. Absent any clear and

---

[3] *See also* Evangeline G. Abriel, *Presumed Ineligible: The Effect of Criminal Convictions on Applications for Asylum and Withholding of Deportation Under Section 515 of the Immigration Act of 1990*, 6 Geo. Immigr. L.J. 27, 35 n.38 (1992) (emphasizing that Congress intended its treatment of refugee applications by aliens with criminal convictions to be consistent with that of the United Nations).

irrevocable incompatibility, the Act and its subsequent revisions must be read in such a way as to satisfy our nation's obligations under the Protocol.

## II. RATIONAL CONSTRUCTION OF THE STATUTE

The interpretation we adopt here not only construes the language of section 243(h)(3) of the Act, which by its terms is applicable comprehensively to applications for withholding of deportation under section 243(h) pending before, on, or after April 24, 1996. It also involves construction of the section 241(b)(3) withholding provisions of the statute which substitutes for section 243(h) effective April 1, 1997. That section provides specifically that an aggravated felony for which a sentence of 5 years is imposed is considered a particularly serious crime, while imposition of a lesser sentence may or may not result in a determination by the Attorney General that the offense is a particularly serious one. Like section 243(h)(3), this amendment is a modification of section 243(h)(2)(B), which we have read to equate conviction of a particularly serious crime with a refugee constituting a danger to the community.

Indeed, Congress' recent expression in section 243(h)(3) of its concern that, notwithstanding any other provision, discretion is to be exercised in the course of our compliance with the Protocol, may prove to be a critical consideration and should not be overlooked. Had Congress not been so emphatic about the Attorney General's discretion in section 243(h)(3), it may have been permissible to read the latest enactment, as the majority attempts to do, as a license to continue the Board's construction of section 243(h)(2)(B). In that case, the IIRIRA amendment would be no more than an attempt to alleviate, in the case of offenses resulting in shorter sentences, the harsh consequence of per se refoulement resulting from categorical designation of all aggravated felonies as particularly serious crimes. In essence, in construing AEDPA, the majority borrows from IIRIRA as though there were no AEDPA.

I do not think such a reading passes muster for two reasons. First, as recognized by the majority, notwithstanding the preexisting designation of certain offenses as particularly serious crimes, Congress has expressed a significant concern for compliance with the Protocol which requires individual consideration consistent with due process before a refugee may be expelled by a signatory country. Second, having once emphatically amended section 243(h) to extend ultimate determinative authority to the Attorney General in AEDPA, Congress retained the original language included in section 243(h)(1), "the Attorney General determines," in the amended section enacted in the IIRIRA. Reading these two provisions together, it is difficult to simply ignore their significance as a mandate for exercise of the Attorney General's discretionary authority in individual cases.

### A. Protocol Requirement of Individual Consideration

Congress stated unequivocally in the Refugee Act of 1980 that it intended to comport precisely with the Protocol. The overreaching principal behind the Protocol is that signatory states may not return a refugee. However, in recognition that there are exceptions to every rule, an exception was carved out for those persons who pose a danger to the host country, either as a security threat or as a danger to the community. This exception is meant to be invoked rarely, for only the most "exceptional" cases. *See* Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria For Determining Refugee Status* para. 154, at 36 (Geneva 1992)("*Handbook*").[4]

It is clear that the Protocol does not require signatory states to tolerate non-nationals who constitute a security risk or a danger to the community. *Id*. at paras. 148, 151, 154. However, it is equally clear that the Protocol expects signatory states to decide matters of refoulement on a case-by-case basis and not to make blanket determinations of ineligibility.

There is an implicit expectation that individual cases will be decided based on the particular facts of each particular applicant. *See id.* paras. 29, 195; *see also id.* paras. 156, 157. In fact, the adjudicator of a refugee claim is obligated to "ensure" that the applicant's case is presented to the fullest extent possible *and* to "evaluate the evidence." *Id*. para. 205(b). A categorical bar which requires per se expulsion preempts any consideration of evidence and does not permit the applicant to present his or her case at all. Conceptually, a categorical bar is at direct odds with the intent of the Protocol. A host country need not grant haven to every refugee, but a host country must at least hear out every refugee.

The majority acknowledges that Congress fully intended to comply with the Protocol and that Congress even went so far as to incorporate Protocol language regarding nonrefoulement into the Act. *See* H.R. Conf. Rep. 781, 96th Cong., 2d Sess. (1980), *reprinted in* 1980 U.S.C.C.A.N. 160, 161. Despite the obvious parallelism between statute and treaty, the majority nonetheless dismisses available resources for interpreting the Protocol, the UNHCR *Handbook* and the express opinions of the UNHCR. It baffles me that the majority can bemoan "the absence of guidance from Congress or the international instruments" regarding the withholding of deportation provisions, and then disregard the best available authorities for ascertaining the intent of the Protocol's drafters.

---

[4] The *Handbook* is a practical guide to interpreting and applying the Convention and Protocol meant to inform government officials concerned with the determination of refugee status in the contracting states. It has been accepted for that purpose by the Board and the courts. *See Matter of Rodriguez-Palma*, 17 I&N Dec. 465, 468 (BIA 1980); *see also Canas-Segovia v. INS*, 902 F. 2d 717 (9th Cir. 1990), *aff'd on other grounds after remand*, 970 F. 2d 599 (9th Cir. 1992); *INS v. Cardoza-Fonseca, supra.*

Even if they are not controlling, the opinions of the UNHCR should not be so readily dismissed. The UNHCR is charged with providing international protection and condemns categorical ineligibility in no uncertain terms: "It is the opinion of UNHCR that a Contracting State which automatically bars an individual convicted of an 'aggravated felony' from withholding of deportation is in violation of the 1967 Protocol Relating to the Status of Refugees." Letter from Anne Willem Bijleveld, UNHCR, to Nadine Wettstein, AILA (May 15, 1996). The UNHCR fully expects any signatory state to hear a withholding claim first before attempting to apply any of the exclusions. *Id.* (citing *Handbook, supra*, para. 176). Moreover, the UNHCR reads the Protocol to require a separate determination of dangerousness. *Id.* (citing Article 33(2) of the Convention); *see also Handbook, supra*, paras. 155-157. Individualized, case-by-case determinations are essential to compliance with the Protocol. Letter from Anne Willem Bijleveld, UNHCR, to Senator Orrin G. Hatch, Chairman, Judiciary Committee (March 6, 1996).

I find it ironic that the majority would sustain an interpretation of the statute that favors a categorical bar when there is clear indication that Congress did not intend such a result. During the formulation of the 1990 Act, where the provision later construed as a per se bar first appeared, the UNHCR expressed its apprehension that this language could be construed in this way and objected because a categorical bar would be incompatible with our commitment to nonrefoulement. Letter from John McCallin, UNHCR, to Senator Alan K. Simpson (May 1, 1990). The UNHCR was promptly reassured that the final language of the 1990 Act would not "deviate from the present system through which the United States conforms to its non-refoulement obligations." Letter from Senator Alan K. Simpson to John McCallin, UNHCR (May 10, 1990).

When, thereafter, this Board and certain courts read the bar into the statute, a principal drafter of the 1990 Act wrote to the Immigration and Naturalization Service and this agency to "clarify" that Congress

> deliberately left undisturbed the responsibility of the Attorney General to determine whether such an alien also "constitutes a danger to the community of the United States." Accordingly, it was our expectation that the Attorney General would continue the practice of accepting applications for withholding of deportation from aliens who are aggravated felons, and it would then be his responsibility to determine whether such an alien is a danger to the community and is otherwise qualified for withholding.

Letter from Senator Edward M. Kennedy, Chairman, Subcommittee on Immigration and Refugee Affairs, to Gene McNary, Commissioner, Immigration and Naturalization Service, and David Milhollan, Director, Executive Office for Immigration Review (April 16, 1992).

While it is true that legislative statements have less force than the clear and plain language of the statute, these statements are of assistance when they corroborate and underscore a reasonable interpretation of an ambiguous provision. *See, e.g., Weinberger v. Rossi, supra*, at 34-35 (1982). However

convenient it might be to dismiss these documents as having de minimis legal weight, the fact remains that Congress did not and does not intend to renege on our obligations under the Protocol. Those obligations, as understood by UNHCR and the drafters of the 1990 Act, include case-by-case determinations.

It is not necessarily unreasonable that the majority has elected to continue in our practice of not weighing the gravity of crime against the gravity of persecution as recommended by the *Handbook. See Handbook, supra*, para. 156. Indeed, while distinctions can be drawn, all refugees qualifying for nonrefoulement under section 243(h) will be persons facing the clear probability of threats to their lives and safety. *INS v. Cardoza-Fonseca, supra; INS v. Stevic, supra*. However, it seems to me incorrect, and unreasonable, to interpret the statutory language to permit blanket determinations of ineligibility, where the international instrument on which our statute is modeled contemplates not only an extraordinary exception to a mandatory form of relief, but specifically refers to due process and individual consideration in determining when that exception may be invoked.

There is no question but that congressional intent is to abide by our obligation of nonrefoulement; we have made a commitment not to return refugees to their countries of persecution except under very limited circumstances. I emphasize that this is our obligation. Indeed when the express language of section 243(h)(3) states that, to insure compliance with the Protocol, the Attorney General may exercise her discretion notwithstanding the presence of a clause designating an aggravated felony as being a particularly serious crime, it implies there is more to be considered before we may treat the fact of a conviction as a basis to deviate from our obligation not to return. This strongly suggests that the inquiry has *not* ended, despite the fact a particular conviction may be classified as being a particularly serious crime.

## B. Attorney General's Discretion to Determine Endangerment

I believe that the majority's perpetuation of the Board's reference to section 243(h)(2)(B) as the "particularly serious crime bar" is a misnomer. In fact, this basis for precluding a refugee from withholding of deportation should be termed the "danger to the community exception."

## 1. Endangerment

As noted above, section 243(h) is part of the codification into domestic law of language in the Convention which provides a narrow exception to the principle of nonrefoulement when, in essence, the security of a country or the safety of its community would be endangered. Significantly, section 243(h) provides that the Attorney General shall not deport or return any alien to a country where his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or

political opinion "if the Attorney General determines" that such a situation is presented. Thus, as our starting point, we are obliged not to return, unless and until the Attorney General determines that an exception is warranted in a given case.

My colleagues would not dispute the principle that no statutory term should be treated as surplusage and that all words must be given legal force. *See, e.g., United States v. Menashe*, 348 U.S. 528, 538-39 (1955); *Allende v. Shultz*, 845 F.2d 1111, 1119 (1st Cir. 1988). However, the majority's interpretation of the statute would eviscerate critical statutory language extending to the Attorney General the authority to decide in which individual case she may appropriately invoke the exception.

It has been argued that if Congress intended a conviction of a "particularly serious crime" to mean that the alien is "per se" a danger to the community, and that such a conviction signaled the end to our international obligations, Congress could have simply stated that aggravated felons are a danger to the community and had precisely the same effect. In the 1990 Act, the argument goes on, Congress could have been even more direct and openly declared aggravated felons categorically ineligible for withholding, as it did with asylum. Since Congress did not say either and the rules of statutory construction require this language to mean something, we cannot conclude that the "particularly serious crime" language triggers a statutory bar to withholding.

I find that this argument has gained some currency given the recent amendments to the statute. Precedent has too readily dismissed the impropriety of nullifying the "danger to the community" language. We should read meaning into that language, not out of it. *See INS v. Cardoza-Fonseca, supra,* at 444 n.28 (suggesting in dicta that section 243(h)(2)(B) is intended to preclude from withholding aliens who have been convicted of serious crimes *and* who constitute a danger to the community).

Recent legislative amendments serve to highlight the focus on endangerment found in the Protocol. Moreover, despite the fact that Congress has visited this provision three times in the last 6 years and twice in the past year alone, it has yet to enter any outright bar to eligibility. In fact, the only express limitation on eligibility for withholding of deportation has been the pronouncement that an alien convicted of an aggravated felony or felonies is deemed to have committed "a particularly serious crime."

## 2. "Attorney General Determines"

Thus, the actual statutory language speaks directly to what constitutes a particularly serious crime and not to who is ineligible for withholding of deportation. More importantly, Congress has not once receded from the discretionary authority extended to the Attorney General by the express statutory language.

The statute has permitted and continues to permit the Attorney General to remove an alien whom she "determines" is not eligible for withholding

because the alien falls within the purview of section 243(h)(2). To conclude that the conviction of a crime designated as being particularly serious automatically forfeits withholding eligibility precludes any exercise of discretion; that is, there is nothing for the Attorney General to "determine." For this provision to have any meaning, the Attorney General  must have some authority to make determinations on a case-by-case basis and not be the rote executor of statute. *United States v. Menasche, supra*, at 538-39 (stating that we must strive to give effect to every word contained in the statute).

In the AEDPA, Congress clearly stated its concern that international obligations not be abrogated. It accomplished this by amending the statute to supplement existing language stating that aggravated felonies were particularly serious crimes, the very language that supported our existing conclusion that a per se determination without further consideration by the Board was satisfactory.  Notably, this enactment, which we today construe, extends absolute discretion to the Attorney General to make determinations of when the exception will be applied.

Not 6 months after the AEDPA, Congress amended the statute by repealing the outright designation that all aggravated felonies are particularly serious crimes. Notably, Congress did not revert back to the previous statutory language,  but instead designated a more limited category of aggravated felonies as particular serious crimes. The language conferring authority for the ultimate determination on the Attorney General remains intact.

In my view, the IIRIRA does not provide an endorsement of our "per se" practice, particularly when viewed in light of the AEDPA. It is far more reasonable to conclude that what Congress has done in the IIRIRA is to designate certain crimes which on their face are to be considered as particularly serious, while leaving the seriousness of other offenses to be determined in the course of the Attorney General's consideration.  This provision extends to the Attorney General the discretion—not the obligation—to deny withholding of deportation to aliens convicted of particularly serious crimes. As a practical matter it seems nonsensical for Congress to create an executive fail-safe and then eviscerate it. The statutory language should not be read both to empower the Attorney General to safeguard our compliance with the Protocol and then to strip her of the authority to do so.

## C.  Consideration of Past Precedent

I recognize that at first blush, the majority's election to exercise the discretion extended to the Attorney General under section 243(h)(3) of the Act by categorically designating certain aggravated felony convictions as particularly serious crimes may look to be a rational interpretation of the statute. It is one the Board has followed for a  number of years, and it appears to further Congress' goal of removing criminal aliens promptly, since it allows speedy determinations without the need for added court time or consideration of individual factors.

However, subsequent reenactment does *not* necessarily constitute Congress' adoption of a construction by the agency which is contrary to the plain statutory language. *See Demarest v. Manspeaker*, 498 U.S. 184 (1991); *see also Brown v. Gardner*, 513 U.S. 115 (1994), in which the Supreme Court ruled that even a longstanding agency regulation not disturbed by intervening legislation should nonetheless be rejected as being contrary to statutory language. Similarly, judicial affirmance of our prior interpretation is not set in stone.

I believe the majority's reliance on a line of cases that appear to endorse Board precedent is ill-placed. Aside from the significant fact that these cases precede the last two legislative revisions, the majority overstates the extent to which these cases endorse that precedent. While it is true that no case has overruled the Board's interpretation, it is also true that the circuits have not been unanimous in their support, nor exhaustive in their reasoning.

Many courts have simply affirmed our interpretation of an ambiguous provision as being reasonable without assessing it de novo in light of the due process requirement in the Convention or the emphasis on individual consideration in the *Handbook. See, e.g., Mosquera-Perez v. INS*, 3 F.2d 553, 555-59 (1st Cir. 1993), quoted by the majority. A common failing in most of these cases is that the courts fall into the same trap as the majority and never focus on the actual language of sections 32 and 33 of the Convention, or give appropriate weight to the provisions in the *Handbook*. Few of these decisions go into any meaningful analysis of the Protocol or the Refugee Act of 1980, or address the language expressly extending to the Attorney General the authority to "determine" our refugee obligations in individual cases. *See Kofa v. INS*, 60 F.3d 1084, 1093 n.1, 1094-95 (4th Cir. 1995) (Hamilton, J., dissenting).

In addition, several courts have recognized the need for more satisfactory guidance. *See, e.g., Garcia v. INS*, 7 F.3d 1320, 1326 n.6 (7th Cir. 1993)(recognizing international commentators' concerns that due process required some consideration of dangerousness); *Al-Salehi v. INS*, 47 F.3d 390, 395 (10th Cir. 1995) (stating its acquiescence only in the absence of some reason to take a different approach). Although the most recent circuit to analyze the endangerment exception followed its sister circuits in deferring to our interpretation, the court expressed its concern that the section should be read to effectuate two determinations. *Ahmetovic v. INS*, 62 F.3d 48, 52 (2d Cir. 1995) (stating the "BIA's failure to give separate consideration to whether [the refugee] is a 'danger to the community'" was troubling).

To merit deference from the judiciary, our interpretation must be reasonable. It must comport with the language, guided by principles of statutory interpretation, as well as with the terms of treaties which our domestic laws are meant to effectuate. Although we do not decide the constitutionality of the statutes which we interpret, our role is to construe statutes to achieve results which are consistent, rather than in conflict, with constitutional

protections. *See Landon v. Plasencia*, 459 U.S. 21, 34-35 (1982); *Bridges v. Wixon*, 326 U.S. 135, 152-53 (1945); *Matter of Cenatice*, 16 I&N Dec. 162, 166 (BIA 1977); *see also, e.g., Matter of Silva*, 16 I&N Dec. 26 (BIA 1976).

In the face of the clarifying amendments that leave the statute in its present form, I would have to conclude that our reasoning in the line of cases including *Matter of C-*, 20 I&N Dec. 529 (BIA 1992), *Matter of K-*, 20 I&N Dec. 418 (BIA 1991), *aff'd, Kofa v. INS, supra*, and *Matter of Carballe*, 19 I&N Dec. 357 (BIA 1986), *modified, Matter of C-, supra, clarified, Matter of K-, supra, modified on other grounds, Matter of Gonzalez,* 19 I&N Dec. 682 (BIA 1988), is flawed. It is flawed because it erroneously curtails the Attorney General's discretion and does not provide a refugee adequate individual consideration before arriving at a conclusion on the fundamental issue of endangerment.

## III. COMPLIANCE WITH THE PROTOCOL UNDER SECTION 243(h)(3)

The language of section 243(h)(3) of the Act indicates that Congress is calling for some additional consideration of an individual refugee in light of his or her having been convicted of a particular crime. Under the statute as amended by section 243(h)(3), a per se determination that an aggravated felony constitutes a particularly serious crime, and that one so convicted is a danger to the community and should be returned, simply is no longer acceptable. Our task now is to determine how to best effectuate that change in order to give the language meaning which comports with the intent of Congress.

The majority concedes that, at a minimum, some further consideration is required by the plain terms of section 243(h)(3). This concession simply cannot be reconciled with the majority's reading of "particularly serious crime" as dispositive. Were that adequate even in some cases, Congress would not have needed to amend the statute to specifically caution that before imposing any preclusion the Attorney General should consider compliance with section 243(h)(1).

## A. Considerations Related to Compliance

In determining which crimes are serious, the signatory state may designate those circumstances or situations of particular concern to it. *Handbook, supra,* paras. 154, 155. I take no issue with the majority to the extent that they reason that Congress should be free to designate the sorts of offenses which may, consistent with the terms of the Protocol, trigger our invoking that exception to our nonrefoulement obligation.

I believe the majority errs when it imports the statutory designation made in the IIRIRA effective April 1, 1997, not as a framework within which to exercise discretion in individual cases as required, but as a means of determining without further consideration that the applicant constitutes a danger

to the community. The fact that the Board began referring to the preclusion under section 243(h)(2)(B) as the particularly serious crime bar, dropping the "constituting a danger to the community" language, is not enough to modify the fact that the Protocol allows refoulement not because someone is a criminal, but only when the safety of the community is endangered.

Originating in 1988, the aggravated felony category developed primarily out of Congress' intent that criminal aliens be expeditiously identified, deported, and barred from reentry. Since 1988, in designating classes of crimes as "aggravated felonies" for purposes of removing criminal aliens from the territory of the United States, Congress was principally responding to domestic concerns. In section 243(h)(3), Congress has manifested its concern that the category of aggravated felony offenses established to give greater priority in deportation, reentry, and other removal-related areas of the law not be conclusive in determining whether international protection should be foreclosed in every case.

Section 243(h)(2)(B) of the Act is not a penalty provision and should not be invoked principally as part of an effort to remove criminal aliens from our country. Indeed, we have pledged to protect all refugees, even those with convictions, unless, in an individual case, that convicted alien constitutes a danger to the community. *Handbook, supra*, paras. 155-157. Thus, it is not a matter of which convictions Congress or the Attorney General may legitimately designate as being particularly serious offenses.

To comport with our international obligations under the Protocol, implementation of section 243(h)(3) calls for a discretionary determination by the Attorney General consistent with due process to determine whether the security or safety of our country is at risk and whether expulsion is permissible. Consequently, it is eminently more consistent with the Protocol and with congressional intent to read Congress as having set a condition precedent, or perhaps created a presumption that in cases in which a particularly serious crime exists, the preclusion might be appropriate.

## B. Practical Considerations in Compliance

The crime on its face, alone, rarely provides a rational basis for concluding that the individual constitutes a danger to the community by virtue of having been convicted of that offense. There is really no necessary relationship between the crime committed and the impact the individual would have on the community if granted refugee status rather than being returned to face either death or persecution. This is true not only of crimes designated as being particularly serious by virtue of being classified as aggravated felonies, but of convictions for all offenses.

Countless common sense examples illustrate this interpretation. A one-time embezzler, a thief, a direct mail fraud "artist," or a tax cheat is considered to be an aggravated felon if a sentence imposed is over 1 year and

would be completely barred under the majority's analysis without further consideration if the sentence imposed is 5 years. While a person guilty of the aggravated felony of money laundering in connection with narcotics trafficking may pose a serious danger to our community, money laundering is defined so broadly that it also would reach a homeowner who made a false statement to a bank in a loan application. Similarly, although each may be convicted of aggravated assault, a battered wife who committed a crime of violence against her spouse in response to a long pattern of abuse should be treated differently than a mugger who accosted persons making withdrawals from an ATM machine.

Furthermore, the *Handbook, supra*, para. 157 states that pardon, amnesty, or even mere completion of sentence results in a presumption that "the exclusion clause is no longer applicable." In determining endangerment, it emphasizes that mitigating factors must be part of the equation.

Thus, I believe that the phrase "particularly serious crime" should be read as a condition precedent to a finding of endangerment which would warrant refoulement. Where predesignated by Congress or by the Attorney General, the aspect of an individual determination involving the nature and type of offense need not be revisited. However, whether or not designated, those factors remain only part of an overall equation of determining endangerment which requires individual consideration.

I point out that, while categorical ineligibility is prohibited by the Protocol, we can nonetheless attempt to accommodate the congressional interest in the prompt removal of all criminal elements, while preserving due process. For example, a rebuttable presumption of dangerousness could be imposed in which an alien who has been convicted of a particularly serious crime is presumed to be a danger to the community unless he or she can prove otherwise.

I do not believe the requirement of an individual determination is the administrative burden the majority implicitly fears. I do not read the statute to require a separate hearing on dangerousness; it only requires that dangerousness be assessed and factored into any decision to refouler an alien to a country of probable persecution. I note that such determinations are routinely made in other contexts, such as bond determinations, with little or no evidentiary display or legal argument and, consequently, with little or no delay. A prompt consideration of dangerousness can readily be incorporated into the course of deportation proceedings in which the refugee's claim of persecution is asserted.

In this case, I cannot conclude that the respondent has received a level of individual consideration that could be deemed reasonable. Although he happens to come within the class of persons that the majority, borrowing from the language of the IIRIRA provision, would agree need not be automatically foreclosed from protection as a refugee, he had no way of knowing what construction we would give to section 243(h)(3). Nor has he had any opportunity to set forth his mitigating equities in a manner that allows the Attorney

General to fairly consider them in determining the impact of his conviction on his request for refugee protection.

## IV.  CONCLUSION

Based on the record before us, I cannot concur that the ultimate result reached by the majority, denying withholding of deportation under section 243(h)(1) to the respondent, is consistent with  our international obligations under the Protocol. While the majority and I agree that Congress means to honor our commitment to the Protocol, we part company on what that obligation entails.  Congress has significantly modified the statutory language, with a clear eye toward our compliance with the Protocol. Such legislative activity, in my mind, commands reexamination and scrutiny of our prior interpretation of that law.

Viewing the language with greater awareness of the force of our international obligations under the Protocol, I do not believe a per se bar is a reasonable interpretation or is justified either by domestic considerations or administrative concerns. Denying an individual further consideration despite his or her conviction having been classified as particularly serious violates both due process and the Protocol.